IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

STATE FARM FIRE AND CASUALTY COMPANY    )
 )
                       Plaintiff,    )
 )
v.    )      Case No.  4:13-cv-00027
 )
JONATHAN ALAN WALLACE *et al.*    )
 )
                      Defendants.    )
 )

## MEMORANDUM OF LAW IN SUPPORT OF STATE FARM
## FIRE AND CASUALTY COMPANY'S MOTION FOR SUMMARY JUDGMENT

Plaintiff State Farm Fire and Casualty Company ("State Farm"), by counsel, for its

memorandum of law in support of its motion for summary judgment, states as follows:

### I. Overview.

This declaratory judgment action arises out of a paint ball gun incident that occurred on

May 3, 2010, in Charlotte County, Virginia.  On that date, defendant Jonathan Alan Wallace

("Wallace"), then age 25, discharged a paint-ball gun in the general direction of a vehicle

operated by defendant Craig Hunter Caldwell ("Caldwell"), then age 17.  One of the paintballs

hit Caldwell in his left eye, severely injuring his eye and requiring medical treatment (including

several eye surgeries at the University of Virginia Medical Center).  The incident was

investigated by the Charlotte County Sheriff's Department, and Wallace was charged criminally

with maliciously shooting at an occupied motor vehicle or other motor vehicle whereby the life

of a person in such motor vehicle or other vehicle was put in peril, in violation of Va. Code §

18.2-154 (a felony offense).  The criminal charge was resolved by a plea agreement with the

Commonwealth, which included Wallace's plea of guilty to the reduced charge of recklessly

handling a firearm in violation of Va. Code § 18.2-56.1; a jail sentence of six months with six months suspended for a period of twelve months conditioned upon being of good behavior, keeping the peace, obeying the Court's order and paying fines and costs; and the payment of restitution in the amount of $3,273.73 to Caldwell's mother, Marjorie Mayberry, for expenses incurred by her related to Caldwell's treatment.

Caldwell and his mother contacted a local attorney to help them pursue a civil claim for damages. On October 8, 2011, Caldwell, by counsel, initiated the underlying state court personal injury action against Wallace. The suit papers were served at the home of Wallace's parents in late October 2011. Wallace's father forwarded the suit papers to his State Farm insurance agent on November 1, 2011. This was State Farm's first notice of the incident.

Due to the lengthy notice delay (547 days), State Farm initiated this declaratory judgment action. Wallace and Caldwell both have answered the complaint. Both contend that the first event putting Wallace on notice of the possibility of a civil claim for damages as a result of the paint-ball incident was the service of the complaint in the state court tort action; that Wallace's duty to report the occurrence under the State Farm Homeowners Policy was triggered by the service of the complaint in the state court tort action; and that Wallace fulfilled his duty to timely report the occurrence to State Farm as required by the conditions of the Homeowners Policy (*see* Doc. 4, Answer by Caldwell, at ¶ 5; Doc. 9, Answer by Wallace at ¶¶ 18-20). Wallace has taken a similar position in discovery. In response to State Farm's Interrogatory No. 8 (filed herewith as Exhibit 1), Wallace has stated:

> I deny that I had a duty to notify State Farm of a claim against me before I was made aware that such a claim was even a possibility. When the underlying incident occurred, I was charged criminally and I paid restitution as a result of the final disposition of that criminal charge. I believed, and Craig Caldwell (nor any other person) gave me any reason to believe that there would be a civil action filed

in this matter. The first notion I had that any civil case would be filed was when I received a copy of the Complaint in the liability action. I then promptly notified State Farm to provide coverage.

(Exhibit 1, Wallace's Answer to State Farm's Interrogatory No. 8).

Accordingly, the single issue squarely presented in this case – as framed by the defendants in their Answers to the Complaint for Declaratory Judgment, and in discovery – is whether the paint-ball incident was sufficiently serious to lead a person of ordinary intelligence and prudence to believe that it might give rise to a claim for damages, thereby triggering the obligation of Wallace and his parents to notify State Farm in accordance with the conditions of the Homeowners Policy.

For the reasons which follow, the undisputed facts of this case compel the conclusion that the paint-ball incident was sufficiently serious to lead a person of ordinary intellect and prudence to believe that it might give rise to a claim for damages, and that Wallace (and his parents) failed to notify State Farm within a reasonable time after the incident. The lengthy notice delay of 547 days was unreasonable as a matter of Virginia law, and was a substantial and material breach of the notice conditions of the Homeowners Policy. State Farm therefore prays for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## II. <u>Statement Of Facts</u>.

1. **<u>The Paint Ball Shooting Incident</u>.** Wallace has testified that the paintball incident occurred between 3 p.m. and 5 p.m. on May 3, 2010 (Exhibit 2, Wallace Dep. at 8). Wallace had been riding dirt bikes and four-wheelers with Billy Snodgrass and Snodgrass's cousin, Craig Caldwell,[1] on the day of the incident (*Id.*). Wallace, Snodgrass and Caldwell had been "kind of

---

[1] Craig Caldwell was age 17 and a junior in high school at the time of this incident. (Exhibit 3, Caldwell Dep. at 4, 6).

goofing off with a paintball gun, shooting trees, shooting fifty-five-gallon barrels in the backyard … taking turns shooting." (*Id.*; see also Exhibit 3, Caldwell Dep. at 10-11)).[2]

According to Wallace, "it was getting later in the day" and Caldwell "left to go do something." (Exhibit 2, Wallace Dep. at 9). Wallace was "about to leave" and "was unloading the paintball gun, just shooting into … some type of bushes beside of my truck, and then it was several large oak trees and then a row of fence." (*Id.*). Wallace recalls that he was "shooting the paintball gun in the direction of the tree 'cause it probably had about fifteen to twenty paintballs in the gun," adding that he was "just going to shoot them out so I didn't have to unload them and have loose paintballs in my vehicle." (*Id.*). Wallace recalls that "kind of about the same time I was shooting, [Caldwell] was driving up the driveway" and "two of [the paintballs] hit the vehicle, I think, like on the back tire and the back lower fender or bumper area" and "what made me stop was we – we heard him screaming and hollering in the vehicle." (*Id.*).[3]

Caldwell testified that the incident occurred at about 4:20 p.m. on May 3, 2010, when he was driving his mother's Suzuki Sidekick "up the driveway to check the mail." (Exhibit 3, Caldwell Dep. at 13-15). Caldwell notes that he "never made it to the mailbox" because as he was "going to the mailbox … that's when the shots hit the truck" and "the third one come

---

[2] Wallace testified: "I think we shot him [Craig Caldwell] several times in the foot, I had gotten shot, Billy had gotten shot in the leg just playing paintball, goofing off throughout the day." (Exhibit 2, Wallace Dep. at 8).

[3] Billy Snodgrass testified that after the incident he asked Wallace what had happened, and Wallace replied that "he was just shooting up in towards the trees trying to just like splatter pain on the vehicle. He wasn't actually trying to shoot the vehicle or shoot Craig … He was just trying to shoot the branches above the vehicle just to kind of splatter paint, I think." (Exhibit 4, Snodgrass Dep. at 24).

4

through the window and hit me in the eye." (*Id.* at 14).[4]  The paintball hit Caldwell in the left eye

and he screamed. (*Id.* at 16, 18).  Caldwell described the experience as follows:

> I'm not going to cuss or anything, but I did say a lot of foul words because of the
> pain.  I remember it hitting me in the eye, and I was – honestly, I was trying to act
> like I was tough and not let them see that it hurt as bad as it did.  It hurt fairly bad,
> and I had actually bent my steering wheel in my truck a little from pushing on the
> steering wheel just trying to take my mind off the pain.  And my cousin Billy was
> riding his little dirt bike right there on the ditch and he come over.  And by the
> time he had came over, I had both my hands like this over my eye.

(Exhibit 3, Caldwell Dep. at 18-19.)  Caldwell recalls that initially he "couldn't really open" his

eye (*Id.* at 19).  Later, after he applied an ice pack, he recalls that "it was kind of blurry and it was

really hard to see through it." (*Id.*).

Caldwell's cousin, Billy Snodgrass, was nearby when the incident occurred.  Snodgrass

testified that he was riding a dirt bike "coming down the edge of the road" when he "noticed

Craig was stopped in the middle of the road for some reason." (Exhibit 4, Snodgrass Dep. at 11).

Snodgrass indicates that he "pulled up" and noticed that Caldwell "was over there crying." (*Id.*).

Snodgrass recalls that Caldwell "was screaming, crying", adding that "you could tell he was –

you know, he was obviously hurt." (*Id.* at 41).  Snodgrass testified that he was trying to calm

Caldwell down and that Caldwell was "just going ballistic." (*Id.* at 42).

Snodgrass asked Caldwell "what was wrong" and indicates that "after [Caldwell] calmed

down a little bit, he said he … believed he got shot." (Exhibit 4, Snodgrass Dep. at 12).

Snodgrass and Wallace subsequently "asked [Caldwell] if he was okay numerous times" and "we

offered to take him to the hospital, …" (*Id.*).  According to Snodgrass, Caldwell replied that "he

---

[4] The window of the Suzuki was rolled down. (Exhibit 3, Caldwell Dep. at 17).

was okay … but, you know, obviously something was wrong with his eye. I mean, that was obvious." (*Id.*).[5]

Wallace recalls that after the incident, Snodgrass "rode over there, and I came over." (Exhibit 2, Wallace Dep. at 9-10). According to Wallace, Billy's girlfriend Amanda "got something frozen, I don't know if it was meat, frozen vegetables or something, to put on his eye" because "you could obviously tell something – something had happened to it by – we kind of naturally assumed it was a paintball because I was shooting a paintball in that direction, you know, at the tree." (*Id.* at 10).[6] Wallace admits that he knew Caldwell was hurt, explaining that Caldwell's left eye was "red around it" and that "we got ice and … stuff for him and kind of sat through it." (*Id.* at 10, 12).[7]

Caldwell testified that after he was hit in the eye, he initially sat in the Suzuki "probably about a half an hour … because at that point I was in so much pain I didn't really want to try to stand, because I didn't know if it might cause blood to flow worse or something or it could damage something more. So I just wanted to sit and relax for a bit." (Exhibit 3, Caldwell Dep. at 19-20). Caldwell was holding his eye the entire time as he sat in the vehicle. (*Id.* at 20).

Caldwell recalls that "once Billy [Snodgrass] came over, it was maybe … about five to fifteen minutes or so, and my cousin Billy actually put his bike down and held the steering wheel and told me to let off the brake. … and he actually steered the Suzuki into the driveway from

---

[5] Snodgrass testified that he and Wallace "kept telling [Caldwell], you know, you might need to go to the hospital or something, you know, you're really hurt; and he kept swearing he was fine." (Exhibit 4, Snodgrass Dep. at 14).
[6] Wallace recalls that Caldwell applied a bag of frozen vegetables to the eye "probably a good fifteen, twenty minutes." (Exhibit 2, Wallace Dep. at 11).
[7] Wallace recalls that "we ended up probably being there another half-hour to forty-five minutes," adding that "I think [Caldwell] rode around a little bit, and … me and Billy may have rode the

outside the vehicle for me into his driveway." (Exhibit 3, Caldwell Dep. at 20). Caldwell

indicates he was screaming for approximately 5 to 15 minutes initially due to the pain. (*Id.* at 21).

While this was happening, Caldwell indicates "I couldn't move my hand away from this eye."

(*Id.*). Caldwell saw Wallace standing in the yard looking over in Caldwell's direction. (*Id.* at 21-

22).

      Caldwell testified that after the car was parked, "Jonathan [Wallace] and my cousin's

fiancée [Amanda] walked up and they were checking on me to make sure I was all right and I

wasn't bleeding or nothing." (Exhibit 3, Caldwell Dep. at 22). Caldwell indicates that Amanda

"had went inside and grabbed … frozen peas or something and brought them out to me." (*Id.*)

Caldwell applied the package of frozen vegetables to his eye, while he was still seated inside the

vehicle. (*Id.* at 22-23).

      Caldwell recalls that Wallace "didn't really say much at first other than checking to make

sure I was okay and talking to me a little bit here and there," adding: " … I think he was more

worried about what had actually happened at that moment, because I think he was sort of in a

state of shock like he didn't realize what actually happened." (Exhibit 3, Caldwell Dep. at 23).

Caldwell explained: "When I first pulled up, he just -- his mouth was like open like he didn't

really understand what was happening at that moment, like he wasn't fully comprehending it ….

I think he was actually in a state of shock and wasn't sure what to do at that point" (*Id.* at 23-24).

      Caldwell testified that about thirty minutes after the incident, he exited the vehicle "and

was leaning up against the hood of my vehicle" still with the ice pack on his eye. (Exhibit 3,

Caldwell Dep. at 24). Caldwell recalls talking with Wallace, who apologized and said

---

four-wheel up and down the driveway a few times just more or less to get your mind off of it, you
know." (Exhibit 2, Wallace Dep. at 10).

"something about giving me a set of mud tires for my truck." (*Id.*).[8] Caldwell testified that Wallace "was basically trying to bribe me from telling anybody what had actually happened." (*Id.* at 25). Caldwell testified further:

> They were 35 inch mud crawlers, or something. … I can't remember exactly what he said. And he told me, he said they would fit on my Jeep and certain – just basically just trying to give me a set of tires to keep me quiet so I wouldn't tell anybody.

(Exhibit 3, Caldwell Dep. at 25.) Caldwell testified that Wallace was offering to give him the mud crawlers as a bribe so that Wallace would not get in trouble. (*Id.*).[9]

Caldwell recalls that although he was still applying ice, the pain started to subside some and "at that point we didn't really think it was that bad," adding however that "we had no idea actually how much damage was done until after I went to the doctor and they looked at it and basically told me I had a detached retina and I had to have surgery." (Exhibit 3, Caldwell Dep. at 26.) Caldwell subsequently rode one of Snodgrass's dirt bikes around the yard "a little bit," but then stopped after ten or fifteen minutes when he "started to get a headache and my eye started to throb." (*Id.* at 27.) At that point, Caldwell told the others that his eye was throbbing and he was going to go home "and take some Ibuprofen and lay down for a little while and see if it helps." (*Id.*).[10]

---

[8] At this point in time, Caldwell recalls that he was "just trying to take my mind off the pain." (Exhibit 3, Caldwell Dep. at 24-25).

[9] Caldwell's mother, Marjorie Mayberry, testified that during the subsequent criminal proceeding, Caldwell informed the Commonwealth's Attorney that Wallace "had made a comment about he didn't want Craig to tell anybody what happened and offering him some kind of tires or something." (Exhibit 6, Mayberry Dep. at 30).

[10] Wallace recalls that Snodgrass "drove [Caldwell] down to his house, and I think his sister was home." (Exhibit 2, Wallace Dep. at 14.) Wallace testified that "about that time, I was leaving." (*Id.* at 15.)

Snodgrass recalls that Caldwell "actually took [the ice pack] home with him … and the next thing we know, he was doing worse. That's what I heard from other family members and stuff." (Exhibit 4, Snodgrass Dep. at 15). Snodgrass further recalls that before Caldwell left, Wallace told Caldwell "if you need to go to the hospital, I would feel more comfortable taking you to the hospital", but Caldwell "kept insisting he was okay." (*Id.* at 34-35). It was obvious, however, that Caldwell was not okay when he left. Snodgrass explained that "something was obviously wrong with his eye" - the eye was swollen and "it was very red." (*Id.* at 53).

**2. Caldwell's Injuries And Medical Treatment.** On the evening of the incident, Caldwell's sister and his cousin Les Paul took Caldwell to the Appomattox County High School to meet an ambulance, which took Caldwell to a hospital in Lynchburg. (Exhibit 3, Caldwell Dep. at 29-30). Caldwell was admitted at the emergency room of Lynchburg General Hospital, and subsequently treated with an eye doctor (*Id.* at 30-31; Exhibit 6, Mayberry Dep. at 11). Caldwell's mother, Marjorie Mayberry, testified that she met her son at the hospital that evening, and that "it was obvious" that his eye had been injured. (Exhibit 6, Mayberry Dep. at 11). Ms. Mayberry testified that her son's treating doctor informed her that "it was severe" and "there was some significant damage to the retina in his eye." (*Id.*). Caldwell subsequently underwent treatment and had several eye surgeries at UVA due to the trauma to his left eye. (*Id.* at 19-20).[11] Asked to describe the current status of Caldwell's eyesight in his left eye, Ms. Mayberry testified, "He can't see." (*Id.* at 51). Caldwell's total claimed medical bills for treatment received as a result of this incident exceeds $80,000 (*Id.* at 52; *see also* Exhibit 8 (Caldwell's Answers to Interrogatories in the underlying state court tort action)).

---

[11] Caldwell testified that for approximately two to three months after the incident, he had to wear an eye patch over his left eye (Exhibit 3, Caldwell Dep. at 52).

Snodgrass recalls that on the evening of the incident, he learned from Caldwell's family that "it was obviously a lot worse and they took him to the hospital." (Exhibit 4, Snodgrass Dep. at 15). Wallace subsequently checked in with Snodgrass "once or twice" on how Caldwell was doing, and Snodgrass told Wallace that Caldwell "ended up having to go to the hospital." (*Id.* at 18).

Wallace testified that he "called periodically that evening" (May 3, 2010) and the following day "just to check on [Caldwell] to see because … it was red and sore," adding "it basically looked like he had been punched in the eye" and "it was noticeable around the eyelid where some – where obviously something had hit it." (Exhibit 2, Wallace Dep. at 16). Wallace indicates that he "felt bad," adding "my mistake, my fault." (*Id.*). Wallace indicates that he "called several times that night and probably several times the next day … just to see if he was okay, if his swelling had gone down." (*Id.*). Wallace recalls that "the next day is when they said they had taken him to the hospital," and that he learned the day after the incident that Caldwell "had been taken to a doctor's office." (*Id.* at 16-17).

**3.** **The Criminal Investigation.** Soon after the incident, Caldwell's mother, Marjorie Mayberry, contacted the Charlotte County Sheriff's Department. Ms. Mayberry explained why: "I just felt at that time – you know, being in the emergency room and everything else and what they were telling me, I figured it was going to be severe. And the position I was in, I was not going to be able to handle his medical bills and the care that he needed and everything else, and it needed to be known that my son was harmed in this way." (Exhibit 6, Mayberry Dep. at 13).

Captain Howard Hobgood of the Charlotte County Sheriff's Department investigated the May 3, 2010 incident. The initial dispatch on May 4, 2010 to Captain Hobgood described the incident as follows: "Caller adv[ised] that a male sub[ject] by the name of John shot her son in

the eye with a paint ball gun. He has damage to his eye." (Exhibit 5, Hobgood Dep. at 7-8; Hobgood Dep. Ex. 4).

On or about May 7, 2010, Captain Hobgood interviewed Marjorie Mayberry and Craig Caldwell. Hobgood recalls that Caldwell was wearing an eye patch and had already been to the doctor. (Exhibit 5, Hobgood Dep. at 8.) Captain Hobgood described the interview as follows:

> Where their home is, it's down at the end of a road, a state road, and then I believe it's a private drive down. Well, back up the road, there is another house up there, and I believe he said that – Craig [Caldwell] said that he was up there. He may have been with some friends or some guys, and they were shooting paint balls. And he had came back by there in her vehicle. I believe it was a little, small SUV. And they had – someone had fired – this guy had fired the paintball at him. And I believe some struck the vehicle. While it was some traces of, looked like, paint ball on that vehicle, I believe around a wheel, or something like that, if I can recall. They had photographed everything. And he stated that the paint ball came through the window and struck him in the eye.

(Exhibit 5, Hobgood Dep. at 9-10.) Hobgood noted at the time of this interview that Caldwell had treated with Dr. Moss at Piedmont Eye Center, and had a detached retina. (*Id.* at 18). Hobgood also noted that the offense involved a "major injury." (*Id.* at 14-15).

Caldwell's mother recalls that Officer Hobgood questioned her about Caldwell's injuries. She informed Hobgood "what they were telling me at the hospital and the doctor's offices at that time, because they said he had significant damage to the retina in his eye, that his eye was swelling so bad and the pressure inside of his eye could actually make his eyeball burst." (Exhibit 6, Mayberry Dep. at 14).

After interviewing Mayberry and Caldwell, Hobgood believes he contacted Wallace that same day (May 7, 2010) (Exhibit 5, Hobgood Dep. at 18). Hobgood described the initial phone interview with Wallace:

> I told him I was calling about the injury that Craig [Caldwell] had about the paint ball incident. And, yeah, he told me that, yeah, they were there. They had been

shooting paint ball. And he shot – he fired a paint ball. He said it ricocheted off a tree limb and must have struck him. And one of the things that Jonathan said was that Craig came back there and they hung around for about two more hours together before he left and went home.

(Exhibit 5, Hobgood Dep. at 19). Hobgood confirmed that Wallace was aware on the day of the incident that Caldwell had been injured, and that his eye had been hit by a paint ball (*Id.*). Hobgood informed Wallace that Caldwell's eye had been injured, that Caldwell had to seek medical treatment with Dr. Moss, and that Caldwell had a detached retina (*Id.* at 19-20). Hobgood informed Wallace that he was investigating the incident and was contemplating charges against Wallace. (*Id.* at 20).

Wallace admits that he learned that Caldwell was receiving "ongoing" medical treatment when he was contacted by Captain Hobgood. (Exhibit 2, Wallace Dep. at 19). Wallace testified:

> [Captain Hobgood] called basically asking just to get a statement of what I just told you about the incident that happened, stated that he was seeking medical – you know, several medical treatments, going to the doctor's office and said that – just basically asked if I was employed. And he asked basically if I had any prior record and then – then basically told me, you know, charges were pending. They – they hadn't been formally pulled out, but they were basically – it was – they were thinking about pulling charges on me.

(*Id.* at 20). Wallace admits that as of the date of this initial phone conversation with Captain Hobgood, he knew that Caldwell had been hurt from the paintball incident and had sought medical treatment for his injuries, and that he (Wallace) potentially was going to be charged criminally as a result. (*Id.* at 20-21).

After speaking with Captain Hobgood, Wallace indicates that he "said something" to his father, Joseph Wallace, adding: "I told him, you know, an officer had called me about a paintball incident. I told him basically what had happened, not that charges were being brought out yet

because we didn't know … I didn't really want to worry him too much at the time if nothing was going to come out of it." (Exhibit 2, Wallace Dep. at 21).

       4. **The Criminal Complaint And Wallace's Arrest.**  On or about June 14, 2010, Captain Hobgood swore out a Criminal Complaint against Wallace which stated in part:

> Under penalty of perjury, I, the undersigned Complainant swear or affirm that I have reason to believe that the Accused committed a criminal offense, on or about 5-3-2010, in the County of Charlotte.

> I base my belief on the following facts:

> Craig Caldwell was in his mother's vehicle and was driving to the end of the driveway.  He went by a house where earlier they were shooting paint ball guns.  When he drove by, Jonathan Wallace shot at the vehicle with paint ball, and one round came through the window and struck him in the eye doing severe damage to his eye.

(Exhibit 5, Hobgood Dep. at 28-29; Hobgood Dep. Ex. 3).  Hobgood confirmed that the substance of the Criminal Complaint previously had been discussed with Jonathan Wallace over the phone. (*Id.* at 29-30).

       After Captain Hobgood swore out the Criminal Complaint, the Magistrate issued a "Warrant of Arrest – Felony" on June 14, 2010. (*see* Exhibit 5, Hobgood Dep. Ex. #5).  The arrest warrant charged Wallace with maliciously shooting at an occupied vehicle or other vehicle whereby the life of a person in such motor vehicle or other vehicle was put in peril, in violation of Va. Code § 18.2-154. (*Id.*).  The arrest warrant was served in the Charlotte County Sheriff's office by Deputy Tom Reeves on June 16, 2010.  That day, Wallace surrendered himself and came to the Charlotte County Sheriff's office, where he was formally arrested, booked, photographed, fingerprinted, and bonded. (Exhibit 5, Hobgood Dep. at 30-31).

       Before the arrest, Captain Hobgood called Wallace and informed him that he was going to be charged with a felony for malicious shooting into an occupied vehicle. (Exhibit 2, Wallace

Dep. at 22).  Wallace testified that he went to the police station and turned himself in (in

Wallace's words, "self-surrender") (*Id.* at 22, 24-28).  Wallace recounted the following events:

> Basically, like I said, the phone call with Officer Hobgood was that the charges
> were brought out, that I need to come down.  I got directions from him to the
> magistrate's office, drove down to the Charlotte County courthouse, basically
> called him when I got there because they had to come around the back and open
> the door.  When – there was a deputy there.  I'm assuming that's Deputy Stevens
> or Steve or Reeves or something.  He was with me on my side of the glass, and
> then the magistrate – I believe it was a video conference magistrate.  And
> basically she read through what all that I was being charged with.  And I had to do
> the … it's like secured bond … sign the paperwork that I was being bonded … out
> as long as I adhere to the rules of not leaving … the state and showing up for my
> dates for appearances.

(*Id.* at 25-26).[12]

After Wallace was formally arrested and charged, he discussed the matter with his father,

Joseph Wallace:

> We sat down that night and basically discussed with the paperwork I had, you
> know, the charge, it was a felony, and went over again the incident that took
> place.  And I believe it was the following day 'cause once I got back from
> Charlotte courthouse, it was obviously after five.  The following day, we
> contacted Robert Evans, which is in the same law office as James Angel.

(Exhibit 2, Wallace Dep. at 29).  Wallace explained to his father what had happened on the day

of the incident, including the fact that Billy Snodgrass's girlfriend Amanda "went in and got the

vegetables and – something frozen, and he had it on his eye for a while …" (*Id.* at 30-31).

Wallace confirms that as of the date of his arrest (or the next day), his father was aware that

Caldwell had been hurt as a result of the incident, adding "I told him that the officer that called

me had said [Caldwell] had been to a doctor's office." (*Id.* at 31).

---

[12] Wallace recalls that he told his father, Joseph Wallace, "I was going down to do this and then
basically let him know the outcome at the end of that." (Exhibit 2, Wallace Dep. at 27).

Jonathan Wallace's father, Joseph Wallace, recalls that he first learned about the paintball incident in or about June 2010, "when Jonathan got papers served for a court hearing on it." (Exhibit 7, Joseph Wallace Dep. at 10). After his son was charged criminally, Joseph Wallace discussed the matter with Jonathan. Joseph Wallace recalls that his son told him that "after they finished dirt bike riding or something that they were paintballing and that Craig was going – leaving or something or another, and they were emptying paintball guns and splatter it on trees and different things and hit – hit the car or something." (*Id.* at 12-13). Joseph Wallace also recalls that Jonathan mentioned "something about … splattering and hitting him on the face or eye." (*Id.* at 13). Joseph Wallace knew that his son had been charged with a felony as a result of the paint ball incident. (*Id.*). So, they retained an attorney, James Angel, Esq., to represent Jonathan. (*Id.*).

**5. The Criminal Proceedings.** The preliminary hearing in the criminal case was on October 19, 2010, in the Charlotte County Juvenile and Domestic Relations District Court. Wallace recalls that for approximately two hours before the case was called, his defense attorney, James Angel, negotiated with the Commonwealth's attorney and eventually they reached a plea agreement. According to Wallace's attorney, Mr. Angel, part of the discussion that day related to the fact that Caldwell "had a pretty serious injury to his eye." (Exhibit 9, Angel Dep. at 17).

One of the terms of the plea agreement was for Wallace to pay what Wallace describes as "restitution of damages," which he understood to be out-of-pocket expenses incurred by Caldwell's mother, Marjorie Mayberry, related to his medical treatment. (Exhibit 2, Wallace Dep. at 42-43). After the plea agreement was reached, the case was called on the Court's docket. (*Id.* at 43-44). The terms of the plea were recited to and approved by the Court (*Id.* at 45). Wallace was sentenced to 6 months in jail, with 6 months suspended for a period of one year. (*Id.*

at 44). Asked whether there was any discussion with the Court about restitution or what is comprised, Wallace testified, "I just remember it was damages that occurred due to the incident." (*Id.*). Immediately after the hearing, Wallace's father wrote a check for $773.73 payable to Caldwell's mother, as a partial payment of the restitution award. (*Id.* at 45-46).

Joseph Wallace, who accompanied his son to the preliminary hearing in the criminal case, testified that the first time that he became aware that Caldwell was asserting an injury claim was at the October 19, 2010 preliminary hearing:

> Q.  … When you and your son met with Mr. Angel, did you at that point know that Craig Caldwell was asserting an injury claim?
>
> A.  No, no. We really didn't even realize that or know that until we got to the criminal court ... and settlement part of it. That was … the first I knew of an injury … you know, and the expense and bills to it.

(Exhibit 7, Joseph Wallace Dep. at 16). Joseph Wallace recalls that there was a plea agreement, explaining "the charges were dropped down to a lesser charge, and then the medical expenses were part of the settlement." (*Id.* at 18). Joseph Wallace's understanding was that the medical expenses were for eye treatment relating to the paintball incident. (*Id.* at 19-20). He wrote a check for partial payment of the restitution award after the preliminary hearing. (*Id.* at 20).

Joseph Wallace admits that as of October 19, 2010, he was aware that Craig Caldwell had been injured in the eye from the paintball incident; that his son, Jonathan Wallace, was the one who fired the paintball gun; that Jonathan had been charged with a felony as a result of the incident; that as a result of a plea deal with the Commonwealth, the felony charge had been reduced to a lesser offense; and that part of the plea deal was that Jonathan would pay restitution in order to reimburse medical expenses incurred as a result of the eye injury (*Id.* at 29-30).

Craig Caldwell attended the preliminary hearing with his mother on October 19, 2010. He recalls there was some discussion about the expenses his mother had incurred (mileage, hotel,

etc.) for the trips back and forth to UVA Medical Center for treatment. (Exhibit 3, Caldwell Dep. at 40-41). Caldwell recalls that when the criminal case was called on the docket, one of the lawyers informed the presiding Judge (in the presence of Jonathan Wallace) that on May 3, 2010 Wallace fired a paintball which hit Caldwell in the eye, and as a result of that incident Caldwell sustained injuries, which required him to seek medical treatment at UVA and other places (*Id.* at 41-42). Caldwell recalls that the Judge "basically asked if I could see," and Caldwell replied that he could not. (*Id.* at 43; *see also* Exhibit 6, Mayberry Dep. at 45-46). Caldwell also recalls a discussion with the Judge regarding restitution, adding "I think it was restitution mainly for my mom on my behalf due to the gas mileage and such going back and forth to Charlottesville." (Exhibit 3, Caldwell Dep. at 44). Caldwell recalls that the amount of the restitution ordered was $3,273.73, which primarily represented costs and expenses incurred by his mother associated with Caldwell's medical treatment at UVA – "getting back and forth and motel room and food and stuff like that." (*Id.* at 45).

Caldwell's mother, Marjorie Mayberry, also attended the preliminary hearing on October 19, 2010. Ms. Mayberry recalls that she brought "papers for what … it was costing me." (Exhibit 6, Mayberry Dep. at 18). She explained: "I was worried about trying to get my son back and forth to these doctors and stuff because it was long distance from where I was at. … And I did bring in papers that I had put down as far as the mileage as to how far I had to go and everything to see that – if I could get some kind of help to take care of being able to continue to take him to the hospital." (*Id.* at 18-19). Ms. Mayberry testified that the restitution award was "for gas mileage and motels … so I can continue taking my son" to his medical providers for treatment (*Id.* at 39). Asked how she arrived at the restitution amount of $3,273.73, Ms. Mayberry replied:

I actually didn't. The Court did. I gave them the mileage from my home to Lynchburg, the times – the amount of times that we had to go to Lynchburg, the amount of times I had to go to Charlottesville, staying in a motel in Charlottesville because he had surgeries and had to be seen early the very next morning.

(*Id.* at 43).

      **6. Communications Regarding Wallace's Potential Liability For Damages.** Soon after the preliminary hearing (in late October 2010 or early November 2010), Ms. Mayberry spoke with a local attorney, Thomas Lawson, about a mistake on the restitution check she had received from Wallace's attorney (Exhibit 6, Mayberry Dep. at 47-48). She recalls that Mr. Lawson "told me not to do anything with the check, to bring it to him." (*Id.* at 48). Ms. Mayberry spoke with Mr. Lawson about the contemplated injury claim and her concern that the restitution money "was not going to cover the medical bills and the expenses for my son." (*Id.*). She recalls that Mr. Lawson advised that "we would take another suit in – later on …for compensation for the pain and suffering and all the medical bills and everything else for Craig." (*Id.* at 48-49). Mr. Lawson also informed Ms. Mayberry that he would contact Wallace's attorney regarding the check (*Id.* at 49).

      By letter dated November 8, 2010, Mr. Lawson returned the restitution check to Wallace's attorney because "[t]he written amount of the check is two thousand dollars and the check amount is $2,500." (Exhibit 6, Mayberry Dep. Ex. #4). In his letter, Mr. Lawson also noted that "I am sure you understand this restitution is what has been ordered by the Court as the result of a criminal case, and has nothing to do with damages to my client from a civil point and does not release your client from any future civil damages." (*Id.*). Wallace's attorney, James Angel, has testified that he spoke with Mr. Lawson on November 7 or 8, 2010 and was aware as

of that date that Caldwell was represented by a personal injury attorney and was contemplating a civil claim for damages (Exhibit 9, Angel Dep. at 26, 30-32).

**7. <u>The State Court Complaint</u>.** The underlying state court tort action was filed on October 18, 2011 (*see* Doc. 1-1, Exhibit A to Complaint for Declaratory Judgment). The complaint filed in the state court action alleges that Caldwell sustained "serious and permanent injuries" as a result of the paint-ball incident and Wallace's negligence, and demands an award of damages in the amount of $500,000. (*Id.*).

Wallace recalls that his father, Joseph Wallace, received the "papers down at his house because that's the address they had" (Exhibit 2, Wallace Dep. at 50). Wallace went to his father's house and reviewed the papers (*Id.*). On November 1, 2011, Wallace's father took the suit papers to his insurance agent, Jack Butler. (Exhibit 7, Joseph Wallace Dep. at 31).

**8. <u>The State Farm Homeowners Policy</u>.** At all pertinent times, Joseph and Laura Wallace were named insureds under the subject State Farm Homeowners Policy (Policy No. 46-BJ-U200-2), a true copy of which is attached to the Complaint for Declaratory Judgment as Exhibit B. (*see* Doc. 1-2).[13] At all pertinent times, Jonathan Wallace (who had lived with his parents "his whole life" as of the date of this incident (Exhibit 7, Joseph Wallace Dep. at 7)) was a resident of his parent's household and therefore an insured by definition under the Homeowners Policy.

At all pertinent times, the Homeowners Policy contained the following notice condition:

**Duties After Loss.** In case of an accident or **occurrence**, the **insured** shall perform the following duties that apply. You shall cooperate with us in seeing that these duties are performed:

---

[13] Joseph Wallace testified that he has had homeowners insurance with State Farm since 1975. (Exhibit 7, Joseph Wallace Dep. at 8-10). Jack Butler has been his insurance agent at all pertinent times. (*Id.* at 10).

      a.   give written notice to [State Farm] or our agent as soon as practicable, which sets forth:

         (1)  the identity of this policy and **insured**;

         (2)  reasonably available information on the time, place and circumstances of the accident or **occurrence**; and

         (3)  names and addresses of any claimants and available witnesses;

      b.   immediately forward to us every notice, demand, summons or other process relating to the accident or **occurrence**;

(Doc. 1-2, at p. 23 of 34, Homeowners Policy, Section II – Conditions (emphasis in original).)

      **9.  State Farm First Notified About This Incident on November 1, 2011.**  Wallace admits that "State Farm or its agent was first notified on or about November 1, 2011 of the alleged incident." (Doc. 9, Wallace's Answer at ¶ 15).  Joseph Wallace handled the insurance claim (Exhibit 2, Wallace Dep. at 50).  Joseph Wallace was aware that he had homeowners coverage with State Farm, but testified the he did not make an insurance claim before November 1, 2011 because he did not know that the insurance policy might apply:

      Q.      … And the prior to November 1, 2011, you did not contact either your agent, Jack Butler, or State Farm regarding the incident, correct?
      A.      No.

      Q.      Okay.  That's correct?
      A.      Didn't realize it was an option that was available, that we'd need it … at that time.

(Exhibit 7, Joseph Wallace Dep. at 36; *see also Id.* at 45 (explaining that he had not contacted Jack Butler about this incident before November 1, 2011 because "I didn't know that it was an option available … Didn't really – didn't realize it was there for the use.").

# III. ARGUMENT

## A.      Standard of Review For Summary Judgment

The applicable standard of review on a motion for summary judgment under Rule 56 is well settled.  As stated by this Court:

> Summary judgment is appropriate when no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). A genuine issue of a material fact exists if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citations omitted), *cert. denied,* 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994); *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1129 (4th Cir.1987). Nevertheless, where the record taken as a whole cannot lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial and summary judgment is appropriate; that is, the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where faced with cross-motions for summary judgment, I must consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law. *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir.2003). When considering each individual motion, the court must take care to resolve all factual disputes and any competing inferences in the light most favorable to the party opposing that motion. *See id.*

*Piedmont Broadcasting Corp. v. Ace American Ins. Co.*, No. 4:08-cv-00039-JLK-MFU, 2009 WL 2148049, at *3 (W.D. Va., July 16, 2009) (unpublished); *see also Brown v. American Bankers Life Assur. Co. of Florida*, 366 F.Supp.2d 410, 412 (W.D. Va. 2005).

In cases involving an insured's breach of the notice conditions of an insurance policy, summary judgment is appropriate where (as here) reasonable persons could not differ as to the inferences to be drawn from the undisputed facts.  *Atlas Insurance Co. v Chapman*, 888 F. Supp. 742, 745 (E.D. Va. 1995), *aff'd* 92 F.3d 1176 (4th Cir. 1996) (noting that "the question of delayed notice may be decided as a matter of law where reasonable men could not differ as to the

inferences to be drawn from the undisputed facts" and granting insurer's motion for summary

judgment on basis that insured's 126-day notice delay was material violation of insurance

policy's notice requirement); *see also State Farm Fire and Casualty Company v. Walton*, 244

Va. 498, 504-05, 423 S.E.2d 188, 192 (1992) (holding "that a delay of over two years in

complying with the provisions of the policy's listed duties after loss is, as a matter of law, such a

substantial and material violation of State Farm's notice requirement that it need not show that it

was prejudiced by the delayed notice").

### B. Wallace Violated The Notice Condition of the Homeowners Policy as A Matter Of Virginia Law

Under Virginia law, which applies in this diversity action, *Erie Railroad Co. v. Tompkins*,

304 U.S. 64, 58 S. Ct. 817 (1938), it is settled that a notice provision in a liability insurance

policy is a condition precedent to coverage, requiring substantial compliance by the insured.

*State Farm v. Scott*, 236 Va. 116, 120, 372 S.E.2d 383, 385 (1988). Generally, the requirement

in a policy that an insured give notice "as soon as practicable" means that notice must be given

within a reasonable time after the accident, and what constitutes a reasonable time will depend on

the facts and circumstances of each case. *Id.* at 120, 372 S.E.2d at 385.

However, "when the facts are undisputed and certain the question becomes one of law for

the court." *State Farm Mut. Auto. Ins. Co. v. Douglas*, 207 Va. 265, 148 S.E.2d 775, 777 (1966).

"The question of delayed notice may be decided as a matter of law where reasonable men could

not differ as to the inferences to be drawn from the undisputed facts." *Atlas Insurance Co. v.

Chapman*, 888 F. Supp. 742, 745 (E.D. Va. 1995), *aff'd* 92 F.3d 1176 (Table), 1996 WL 436562

(4th Cir., July 23, 1996).

In *State Farm Fire & Cas. Co. v. Walton*, 244 Va. 498, 423 S.E.2d 188 (1992), for example, a group of four teenagers entered a partially completed house and negligently caused a fire which destroyed the house and its contents. Three of the teenagers were insured under homeowner's policies issued by State Farm. The families of two of the teenagers reported the incident to State Farm and State Farm was able, through its investigation, to identify all of the participants in a timely fashion. However, neither Wade Walton (one of the teenagers) nor his parents (who were named insureds under a State Farm homeowners policy) reported the incident to State Farm until Walton was served with process in a tort action arising out of the fire. The report was made three years after the fire and two years after Walton's father received a letter pertaining to the claim. Upon receipt of notice from Walton, State Farm filed a declaratory judgment action seeking a declaration that Walton had breached the terms and conditions of the homeowner's policy. It conceded that it had suffered no prejudice to its investigation because of the reporting delay. The notice condition in *State Farm v. Walton* was identical to the notice condition in the instant case.

Like the defendants here, Walton argued that his duty to give notice did not arise until he was served with process in the tort action. The Supreme Court of Virginia disagreed, however, noting that "an 'occurrence' which gives rise to a duty of notice to an insurance company means an 'incident which was sufficiently serious to lead a person of ordinary intelligence and prudence to believe that it might give rise to a claim for damages covered by [the] policy.'" *State Farm v. Walton*, 244 Va. 498, 504, 423 S.E.2d 188, 192 (1992) (citing Black's Law Dictionary 1080 (6th ed. 1990)). The Court explained that "[a]lthough there might be some dispute as to whether the duty of notice arose after the sheriff and fire chief interviewed Wade [Walton] in his mother's presence, there can be little doubt that such a duty arose upon" Walton's step-father's receipt of a

letter from the claimant's attorney advising of a potential claim. *State Farm v. Walton, supra,* 244 Va. at 504, 423 S.E.2d at 192. At that time, the Court held that either Walton (who was age 17 and a resident of his parent's household) or his parents on his behalf were required to notify State Farm of the incident.

The Supreme Court of Virginia in *Walton* instructed that "[s]uch a requirement of timely notice of an accident or occurrence is a condition precedent to an insurance company's liability coverage requiring 'substantial compliance by the insured.'" *State Farm v. Walton, supra,* 244 Va. at 504, 423 S.E.2d at 192 (citations omitted). The Court further noted that "if a violation of the notice requirement is substantial and material, the insurance company need not show that it was prejudiced by such a violation." *Id.* at 504, 423 S.E.2d at 192 (citation omitted). This is so because in cases where (as here) "no notice is given, lack of prejudice is not an issue, and the failure to give the required notice becomes as a matter of law." *Id.* at 504-05, 423 S.E.2d at 192. The *Walton* Court concluded that "a delay of over two years in complying with the provisions of the policy's listed duties after loss is, as a matter of law, such a substantial and material violation of State Farm's notice requirement that it need not show that it was prejudiced by the delay." *Id.* at 505, 423 S.E.2d at 192.

*Virginia Farm Bureau Mut. Ins. Co. v. Sutherland*, No. 7:03-cv-00122-SGW, 2004 WL 2360162 (W.D. Va., Oct. 19, 2004) (unpublished) also is instructive. In that case, on November 11, 2000, Sutherland was operating a vehicle owned by his uncle (who was also the named insured under Virginia Farm Bureau's policy) and struck a pedestrian, Leon. Leon was transported to the hospital by ambulance, and Sutherland was arrested at the scene and later convicted for driving under the influence. On the day of the incident, Sutherland informed his uncle about the accident by phone from the jail. Neither Sutherland nor his uncle notified

Virginia Farm Bureau about the incident until July 5, 2002, when Sutherland's uncle notified the insurer that he had just received (on July 3) a letter notifying him of a liability claim raised by Leon. Under these circumstances, the Western District of Virginia Court held as follows:

> Virginia courts construe a notice provision as a condition precedent to liability. The insured's failure to give timely notice voids the insurer's obligation under the policy. Because the Court finds that a 601-day delay in providing notice is untimely as a matter of law and that Sutherland was not excused from providing notice, Virginia Farm Bureau is not obligated to defend or indemnify Sutherland.

*Virginia Farm Bureau Mut. Ins. Co. v. Sutherland,* 2004 WL 2360162 at *1. The Court determined that "a delay of 601 days is beyond the outer limits of reasonableness." *Id.* at *2. In so holding, the Court observed that

> Virginia courts have generally held that notice given beyond 75 days, without a reasonable excuse, is untimely. *See, e.g., Lord v. State Farm Fire & Cas. Co.,* 224 Va. 283, 295 S.E.2d 796, 799–800 (Va.1982) (holding that a 173–day delay constituted untimely notice); *State Farm Mut. Auto. Ins. Co. v. Porter,* 221 Va. 592, 272 S.E.2d 196, 200 (Va.1980) (holding that a delay of seven months constituted untimely notice); *See also, Chapman,* 888 F.Supp. at 746 (applying Virginia law to find that a 126–day delay was a substantial and material breach of the notice provision).

*Virginia Farm Bureau Mut. Ins. Co. v. Sutherland,* 2004 WL 2360162 at *2.

The *Sutherland* Court concluded that under Virginia law, the 601-day delay was "a substantial and material breach of a condition precedent of the policy." *Id.* at *2. In so holding, the Court found that "[t]he undisputed circumstances of the accident and Leon's injury and treatment provided reasonable grounds for Sutherland to believe that a claim might arise, and the delay in notifying Farm Bureau is not excusable." *Id.* The Court also rejected as irrelevant the tort claimant's argument that Virginia Farm Bureau was not prejudiced by the delay, explaining:

> The court need not reach this issue because Sutherland failed to provide any notice to Virginia Farm Bureau for 601 days. Absence of prejudice is relevant to materiality only where the insured gives incomplete information to the insurer, not where, as here, the insured provides no information at all.

*Virginia Farm Bureau Mut. Ins. Co. v. Sutherland, supra*, 2004 WL 2360162 at *3 (citing *State Farm v. Walton*, 244 Va. 498, 504, 423 S.E.2d 188, 192 (1992)). Thus, the *Sutherland* Court determined that "[b]ecause … the failure to give notice for 601 days is a 'substantial and material' violation of the policy, Virginia Farm Bureau is not required to show that it was prejudiced by the delay." *Id.*; *see also American Motor Inns v. Harbor Ins. Co.*, 590 F.Supp. 468, 472 (W.D. Va. 1984) (where insured waited 2½ years to inform insurer of accident, it breached the notice requirement of insurance policy, thus barring a recovery from the insurer); *State Farm Fire and Casualty Co. v. Sutphin*, No. 7:07-cv-00489-GEC-MFU (W.D. Va., June 18, 2008) (unpublished Memorandum Opinion filed herewith as Exhibit 10, holding that where insured did not provide any notice to State Farm until after she was served with process in underlying state court tort action, 752 days after dog bite incident giving rise to the claim, the reporting delay was unreasonable as a matter of law and constituted a substantial and material breach of the notice requirement of the State Farm homeowners policy).

*Liberty Mut. Ins. Co. v. Safeco Ins. Co. of America*, 223 Va. 317, 288 S.E.2d 469 (1982) also is instructive. In that case, there was only a 51-day delay between the date of the accident and the date of notice. The Supreme Court of Virginia noted that

> there is no evidence to indicate Blakeney [the insured] was prevented by reason of health, or other circumstance, from personally notifying Safeco seasonally, or from having someone notify the company for him promptly. He was not injured in the accident. At the scene, Blakeney had full knowledge that personal injuries and property damage resulted from his conduct. *He should have been further impressed by the gravity of the situation when he was issued a traffic summons, charged with a criminal violation, and ordered by the police to file an official accident report.* And yet, written notification was not given for at least 51 days.

223 Va. at 324, 288 S.E.2d at 473 (emphasis added). The Supreme Court of Virginia concluded that "[u]nder these circumstances, such delayed notice, without any justification whatever, constitutes a breach of the policy condition in question." *Id.*

On the issue of delayed notice, two related principles of Virginia law are particularly relevant here. First, it is settled Virginia law that an insured's failure to provide timely notice will not be excused or justified by the insured's ignorance of the policy provisions. In *Lord v. State Farm Mut. Auto. Ins. Co.,* 224 Va. 283, 295 S.E.2d 796 (1982), for example, the insured argued that a 5-month delay should be excused because the nature of the claim was "novel" and one which a layman, not skilled in insurance matters, would not expect to be covered by the policy. The Supreme Court of Virginia rejected this argument, finding that Mr. Lord was well educated and was not prevented by his injuries from promptly notifying the insurer or having someone notify the insurer on his behalf. Instead, the Court determined that Mr. Lord "simply was ignorant of the policy provisions which arguably, may have covered his medical expenses." 224 Va. at 288, 295 S.E.2d at 800. Under these circumstances, the Court concluded that "the delayed notice, without sufficient justification, constitutes a beach of the notice conditions of the policy in question." *Id.* at 288, 295 S.E.2d at 800; *see also Dan River Inc., v. Commercial Union Insurance Co.,* 227 Va. 485, 489, 317 S.E.2d 485, 487 (1984) ("Failure to give timely notice will not be excused when the insured only subjectively concludes that coverage under the policy will not be implicated. Such a policy provision requires the insurer to be notified whenever, from an objective standpoint, it should reasonably appear to the insurer that the policy may be involved").

Second, an insured's failure to provide timely notice is not justified by his subjective belief that the incident will not precipitate a claim or lawsuit. In *Atlas Insurance Co. v. Chapman*, 888 F. Supp. 742 (E.D. Va. 1995), *aff'd* 92 F.3d 1176 (Table), 1996 WL 436562 (4th

Cir., July 23, 1996), the Eastern District of Virginia considered a situation in which an individual notified his insurer of an accident 126 days after the accident. The notice provision in Atlas Insurance Co.'s insurance policy was similar to the notice provision in the State Farm homeowners policy in this case. In *Atlas Insurance Co. v. Chapman*, the insurer filed a declaratory judgment action seeking a declaration that the insured had violated the policy notice condition because of the reporting delay. The District Court entered summary judgment in favor of the insurer, explaining that the

> duty to provide prompt notice of an accident is governed by objective standards [and] failure to provide timely notice is not justified by either a purely subjective conclusion that coverage is not implicated or by the insured's ignorance of the notice provision.

*Atlas Insurance Co. v. Chapman*, 888 F. Supp. 742, 745 (E.D. Va. 1995). "In short, an insured's subjective opinion that an accident will not precipitate a claim under the policy is irrelevant to the question of whether notice should be provided." *Id.* The District Court in *Atlas Insurance Co. v. Chapman* held, as a matter of law, that the insured's "four month delay in notifying the insurer, without any excuse or sufficient justification, constitutes a substantial and material breach of the notice provision, which is a condition precedent to coverage." *Id.* at 746 (noting that the insured "knew about the accident on the day it occurred" and "on the very day of the accident he understood the seriousness of the accident and even requested his secretary to contact the hospital and arrange for the payment of [the claimant's] medical expenses"); *see also State Farm Fire and Cas. Co. v. Sutphin, supra* (holding that insured's failure to provide timely notice was not justified by her subjective belief that a lawsuit would not be filed); *see also GEICO v. Gilmer*, 32 Va. Cir. 94, 1993 WL 945884 (Charlottesville Cir. Ct. 1993) (Swett, J.) (granting summary judgment to insurer where insured's "only reason for not reporting the accident was

28

that she did not believe that [the claimant] was injured and that she would undertake to personally pay for the damage to his vehicle", noting that "[w]hile she is free to make this election, she does so at the risk of the loss of her insurance coverage for failure to notify her insurer within a reasonable time after the accident").

In the appeal which followed in *Atlas Insurance Co. v. Chapman*, *supra*, the Fourth Circuit affirmed the District Court's award of summary judgment to the insurer. The Fourth Circuit explained:

> The insurance contract between Atlas and Chapman Lumber requires that Chapman Lumber give notice to Atlas "as soon as practicable after an 'occurrence' or offense which may result in a claim." William Chapman knew on October 28, the day of the accident, that Barnes had been seriously injured while working at Chapman Lumber and had been taken to the hospital by ambulance. Chapman knew on that day and in the weeks to follow that Barnes was incurring, and Chapman Lumber paying, significant medical costs. Yet Chapman notified Atlas 126 days after the fact.

*Atlas Insurance Co. v. Chapman*, 92 F.3d 1176 (Table), 1996 WL 436562, at *1 (4th Cir., July 23, 1996) (unpublished). In reaching its decision, the Fourth Circuit noted that the insured "had no legitimate justification for its four month delay in notification" and that "[t]he only explanation that Chapman offered was that he and Barnes had known each other for years, and while he felt an obligation to reimburse Barnes for medical expenses, *it never occurred to him that Barnes would seek additional damages*." *Id.* (emphasis added).

With the foregoing principles in mind, the undisputed facts in this case inexorably lead to the conclusion that Wallace's 547-day delay in notifying State Farm about the May 3, 2010 paintball gun incident was a substantial and material violation of the notice conditions of the subject Homeowners Policy.

From an objective standpoint, the paint-ball incident was sufficiently serious to lead a person of ordinary intellect and prudence to believe that it might give rise to a claim for damages. The following facts compel this conclusion:

1. Wallace knew that Caldwell was hurt as a result of being shot in the left eye with a paintball, as evidenced by Caldwell's screaming and crying after the incident, the need to cover his eye with an ice pack, and Wallace's admission that Caldwell's eye was red and that "you could obviously tell something ... had happened to it" (Exhibit 2, Wallace Dep. at 10, 12);

2. According to Caldwell, Wallace appeared to be "in a state of shock like he didn't realize what actually happened." (Exhibit 3, Caldwell Dep. at 23). Caldwell explained: "When I first pulled up, he just -- his mouth was like open like he didn't really understand what was happening at that moment, like he wasn't fully comprehending it. … I think he was actually in a state of shock and wasn't sure what to do at that point" (*Id.* at 23-24);

3. According to Snodgrass, he and Wallace offered to call an ambulance or take Caldwell to the hospital because "obviously something was wrong with his eye" (Exhibit 4, Snodgrass Dep. at 12);

4. Wallace admits that he felt responsible for the incident (Exhibit 2, Wallace Dep. at 16);

5. According to Caldwell, Jonathan apologized to him and said "something about giving me a set of mud tires for my truck." (Exhibit 3, Caldwell Dep. at 24). Caldwell explained that Wallace "was basically trying to bribe me from telling anybody what had actually happened" and offering to give him the mud crawlers so that Wallace would not get in trouble (*Id.* at 25);

6. Within a day of the incident, Wallace knew that Caldwell had sought medical treatment for the eye (Exhibit 2, Wallace Dep. at 16-17);

7. On or about May 7, 2010, Wallace knew that the incident was being investigated by the Charlotte County Sheriff's Department. At that time, Captain Hobgood called Wallace and informed him that he was investigating the incident and was contemplating charges against Wallace. Hobgood confirmed that Wallace was aware on the day of the incident that Caldwell had been injured, and that his eye had been hit by a paint ball. Hobgood informed Wallace that Caldwell's eye had been injured, that Caldwell had to seek medical treatment with Dr. Moss, and that Caldwell had a detached retina as a result of the incident (Exhibit 5, Hobgood Dep. at 18-20);

8. Wallace admits that he learned that Caldwell was receiving "ongoing" medical treatment when he was contacted by Captain Hobgood, and admits that he knew the local authorities "were thinking about pulling charges on me" (Exhibit 2, Wallace Dep. at 19-20). Wallace admits that as of the date of his initial phone conversation with Captain Hobgood, he knew that Caldwell had been hurt from the paintball incident and had sought medical treatment for his injuries, and that he (Wallace) potentially was going to be charged criminally as a result. (*Id.* at 20-21).

There is no suggestion in this case that Wallace was prevented by reason of health, or other circumstance, from timely notifying State Farm of the incident or from having someone (i.e., his parents) notify State Farm for him. As demonstrated above, within days of the incident, Wallace had full knowledge that personal injuries resulted from his conduct on May 3, 2010. Wallace should have been further impressed by the gravity of the situation when only days after the incident he was contacted by Captain Hobgood regarding his potential criminal liability for

the incident, and when on June 14, 2010 he was formally served, arrested and charged with maliciously shooting at an occupied motor vehicle or other motor vehicle whereby the life of a person in such motor vehicle or other vehicle was put in peril, in violation of Va. Code § 18.2-154 (a felony).[14]  Under the circumstances, the paint ball shooting incident clearly was sufficiently serious to lead a person of ordinary intelligence and prudence to believe that it might give rise to a claim for damages covered by the policy.

The plain language of the State Farm Homeowners Policy required Wallace (and his parents) to notify State Farm "as soon as practicable" about the incident.  Substantial compliance with this notice provision was a condition precedent to coverage under the policy.  There is no dispute that State Farm was not notified about this incident until November 1, 2011, after Wallace was served with Caldwell's state court complaint.  As a matter of law, this lengthy delay (547 days) in providing notice was untimely under the precedent cited above, and there being no justifiable reason why Wallace should be excused from providing notice to State Farm, State Farm should be relieved from any obligation it might otherwise have to defend or indemnify Wallace for the claims made by Caldwell.

The only excuse offered by Wallace is his subjective belief that a lawsuit would not be filed.  *See* Exhibit 1 hereto, Wallace's Answer to State Farm's Interrogatory No. 8 ("The first notion I had that any civil case would be filed was when I received a copy of the Complaint in the

---

[14] State Farm also notes that as of November 8, 2010, Wallace's defense attorney in the criminal proceeding had been notified by Caldwell's personal injury attorney, verbally and in writing, that Caldwell was contemplating a civil claim for damages.  Although Wallace claims that his attorney did not relay this information to him, since this information was communicated to his attorney Wallace is deemed to have knowledge of the same.  *See, e.g., Link v. Wabash R. Co.*, 370 U.S. 626, 634 (1962) (noting that in "our system of representative litigation … each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" (citation omitted)).

liability action."). But such a subjective belief is not a viable excuse under Virginia law. *See*

*Lyon v. The Paul Revere Life Ins. Co.*, 289 F.Supp.2d 740, 744 (W.D. Va. 2002) ("The mere

belief that the injured party will not sue is not a sufficient excuse for the delay in giving notice").

"[A]n insured's subjective opinion that an accident will not precipitate a claim under the policy is

irrelevant to the question of whether notice should be provided." *Atlas Insurance Co. v.*

*Chapman*, 888 F. Supp. 742, 745 (E.D. Va. 1995); *see also Atlas Insurance Co. v. Chapman*, 92

F.3d 1176 (Table), 1996 WL 436562, at *1 (4th Cir., July 23, 1996) (finding that the insured "had

no legitimate justification for its four month delay in notification" where "[t]he only explanation

that Chapman offered was that he and Barnes had known each other for years, and while he felt

an obligation to reimburse Barnes for medical expenses, *it never occurred to him that Barnes*

*would seek additional damages*." *Id.* (emphasis added)). The undisputed circumstances of the

accident, Caldwell's injury and subsequent medical treatment, and the criminal investigation and

criminal prosecution which ensued provided reasonable grounds for Wallace to believe that a

claim might arise. His lengthy delay in notifying State Farm is not excusable.

 Wallace may argue that State Farm was not prejudiced by his delay. However, whether

State Farm was prejudiced by the delay is relevant to materiality only where the insured gives

incomplete information to the insurer, not where (as here) the insured provides no information at

all. *See State Farm v. Walton*, *supra,* 244 Va. at 504, 423 S.E.2d at 192; *Virginia Farm Bureau*

*Mut. Ins. Co. v. Sutherland*, *supra* No. 7:03-cv-00122-SGW, 2004 WL 2360162, at *3 (W.D.

Va., Oct. 19, 2004). Moreover, "under Virginia law prejudice is implicit in the insurance

company's ignorance of the accident; proof of prejudice is unnecessary." *Lumbermen's Mutual v.*

*Harleysville Mutual*, 287 F.Supp. 932, 938-39 (W.D. Va. 1968) (noting that the purpose of an

insurance policy's notice condition "is obviously to give the insurer an opportunity to make a

timely investigation of all the circumstances and to prepare an adequate defense, if necessary, on behalf of the insured" (citations omitted)). Indeed, State Farm had the right under the homeowner's policy, "for the insured's benefit as well as its own, to ascertain the relevant facts as promptly as possible before recollections fade[d] and witnesses disappear[ed]", *Lord v. State Farm*, 224 Va. 283, 287, 295 S.E.2d 796, 799 (1982), but was deprived of that right. Having received no notice of this incident for 547 days, State Farm was "deprived of its opportunity of prompt investigation and also the opportunity to negotiate for a settlement before the institution of the damage suit, …" *Allen v. Maryland Cas. Co.*, 259 F.Supp. 505, 507 (W.D. Va. 1966).[15]

In this case, Wallace provided no notice and no information to State Farm for 547 days after he severely injured Caldwell's left eye with a paintball. Like the 601-day delay in *Virginia Farm Bureau Mut. Ins. Co. v. Sutherland* 2004 WL 2360162 at *1, which the Western District of Virginia found was "beyond the outer limits of reasonableness", rendering irrelevant the issue of prejudice, so too in this case any argument that State Farm was not prejudiced by Wallace's delay should be rejected as a matter of law, since "[a]bsence of prejudice is relevant to materiality only where the insured gives incomplete information to the insurer, not where, as here, the insured provides no information at all." *Virginia Farm Bureau Mut. Ins. Co. v. Sutherland, supra,* 2004 WL 2360162 at *3.

---

[15] *Compare Republic-Franklin Insurance Co. v. Silcox*, 92 F.3d. 602, 605-06 (7th Cir. 1996) (rejecting insured's argument that insurer was not prejudiced by notice delay, the Seventh Circuit observed that "With prompt notice from [the insured], the insurance company might have had an opportunity to collect evidence relevant to the damages that the [plaintiffs] suffered, and this evidence might have helped the company prove that the [plaintiffs] were entitled to less than $60,000.00. Moreover, the company might have been able to negotiate an early settlement with the [plaintiffs] for less than that amount . . . the district court was correct to find prejudice").

# IV. CONCLUSION

The premises considered, State Farm Fire and Casualty Company prays that this Honorable Court grant its motion for summary judgment and declare that State Farm has no obligation under the subject Homeowners Policy to provide Personal Liability coverage (including a defense and indemnity) to Jonathan Alan Wallace for his potential liability to Craig Hunter Caldwell for damages arising out of the May 3, 2010 paint ball incident, and likewise no obligation to provide Personal Liability coverage (including a defense and indemnity) for any of the claims alleged by Caldwell in the underlying state court tort action.

STATE FARM FIRE AND CASUALTY COMPANY

Date:  December 16, 2013        By:     /s/ Alexander S. de Witt
                                        Alexander S. de Witt, VSB 42708
                                        BRENNER, EVANS & MILLMAN, P.C.
                                        P.O. Box 470
                                        Richmond, VA  23218-0470
                                        Phone: (804) 644-1300
                                        Fax: (804) 644-1354
                                        E-mail: adewitt@beylaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of December, 2013, I electronically filed the foregoing MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT with the Clerk of this Court using the CM/ECF system, which will send notification of such filing to the following filing users: Michael A. Nicholas, Esq., Daniel, Medley & Kirby, P.C., P.O. Box 720, Danville, VA 23543-0720, E-mail: mnicholas@dmklawfirm.com; Thomas L. Phillips, Jr., Esq., Phillips, Morrison, Johnson & Ferrell, 12576 Wards Road, Rustburg, VA 24588, E-mail: tphillips@pmjf.com.

                                        /s/ Alexander S. de Witt
                                        Alexander S. de Witt, VSB 42708
                                        BRENNER, EVANS & MILLMAN, P.C.
                                        P.O. Box 470
                                        Richmond, VA  23218-0470
                                        Phone: (804) 644-1300
                                        Fax: (804) 644-1354
                                        E-mail: adewitt@beylaw.com