IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| STATE FARM FIRE AND CASUALTY COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | Case No.: 4:13-cv-00027 |
| v. | ) ) | **MEMORANDUM OPINION** |
| JONATHAN ALAN WALLACE and CRAIG HUNTER CALDWELL, | ) ) ) | By: Hon. Jackson L. Kiser Senior United States District Judge |
| Defendants. | ) ) | |

On December 11, 2013, Defendant Craig Hunter Caldwell filed a Motion for Summary Judgment in this action.  (See Caldwell Mot. for Summ. J., Dec. 11, 2013 [ECF No. 22].)  Shortly thereafter, Defendant Jonathan Alan Wallace filed a similar motion, and Plaintiff State Farm Fire and Casualty Company filed a cross-motion for summary judgment.  (See Wallace Mot. for Summ. J., Dec. 16, 2013 [ECF No. 24]; Pl.'s Mot. for Summ. J., Dec. 16, 2013 [ECF No. 26].)  The parties thoroughly briefed the issues and appeared for oral argument on January 24, 2014.  After reviewing the Record and the arguments of the parties, the matter is now ripe for disposition.  For the reasons stated below, I will deny the defendants' Motions for Summary Judgment and grant Plaintiff's Motion for Summary Judgment.

I.  **STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**

On May 3, 2010, Defendant Jonathan Alan Wallace ("Wallace"), Defendant Craig Hunter Caldwell ("Caldwell"), and non-party William "Billy" Snodgrass ("Snodgrass") were riding dirt bikes and shooting paintball guns on Snodgrass's property in Red House, Virginia.  (Def. Wallace Br. in Supp. of Mot. for Summ. J. pg. 2 [ECF No. 25] [hereinafter "Wallace Br."]; Pl.'s Br. in Supp. of Mot. for Summ. J. pg. 2 [ECF No. 27] [hereinafter "Pl.'s Br."].)  Wallace was 25

years old at the time, and Caldwell, Snodgrass's cousin, was 17.  (Pl.'s Br. pg. 1, 3 n.1.)  While shooting paintballs at each other, Defendants admit that they only aimed at one another's lower extremities.  (Caldwell Dep: 11:22−25, Oct. 16, 2013.)  Between 3:00 and 5:00 p.m., Caldwell was driving his mother's Suzuki Sidekick up the driveway while Wallace was in the process of emptying his paintball gun by firing the remaining paintballs in the direction of some nearby trees.  (Wallace Br. pg. 2; Pl.'s Br. pg. 3−4.)  At that time, "two of [the paintballs] hit the vehicle . . . like on the back tire and the back lower fender or bumper area" and "what made [Wallace] stop was [they] heard [Caldwell] screaming and hollering in the vehicle."  (Wallace Dep. 9:19−23, Oct. 8, 2013.)  According to Caldwell, the driver's window of the vehicle was down, and "when the shots hit the truck . . . the third [paintball] come [sic] through the window [of the vehicle] and hit [Caldwell] in the eye."  (Caldwell Dep. 14:10−12.)  Caldwell described the immediate aftermath as follows:

> I'm not going to cuss or anything, but I did say a lot of foul words because of the pain.  I remember it hitting me in the eye, and I was—honestly, I was trying to act like I was tough and not let them see that it hurt as bad as it did.  It hurt fairly bad, and I had actually bent my steering wheel in my truck a little from pushing on the steering wheel just trying to take my mind off the pain.  And my cousin Billy [Snodgrass] was riding his little dirt bike right there on the ditch and he come over.  And by the time he had come over, I had both hands . . . over my eye.

(Caldwell Dep. 18:21−19:6.)  There was no blood, but Caldwell's eye was watering.  (Id. 19:7−9.)  Wallace testified that, although he did not know how a paintball went into the car, "you could obviously tell . . . something had happened to [his eye] by—we kind of naturally assumed it was a paintball because I was shooting a paintball in that direction, you know, at the tree."  (Wallace Dep. 10:1−9.)

According to Snodgrass, he was riding his dirt bike when the incident happened.  He noticed Caldwell "was stopped in the middle of the road for some reason," and, when Snodgrass pulled up to the Suzuki Sidekick, he noticed that Caldwell "was over there crying."  (Snodgrass Dep. 11:13−17, Nov. 14, 2013.)  Snodgrass testified that Caldwell "was definitely crying.  I mean, he was screaming, crying.  You could tell he was—you know, he was obviously hurt, I mean."  (Id. 41:21−24.)  Snodgrass asked Caldwell numerous times if he was alright and offered to take him to the hospital; Snodgrass testified that Caldwell "swore that he was okay."  (Id. 12:16−19.)  Snodgrass's girlfriend, Amanda, retrieved "something frozen . . . frozen vegetables or something," for Caldwell to put on his eye.  (Wallace Dep. 10: 1−3.)  Caldwell recalls that he "couldn't really open" his eye and that, after he applied an ice pack to the injury, his vision "was kind of blurry and it was really hard to see through [his eye]."  (Caldwell Dep. 19:16−18.)  Caldwell testified that he sat in the Suzuki Sidekick for "about a half hour . . . [b]ecause at that point [he] was in so much pain [he] didn't really want to try to stand, because [he] didn't know if it might cause blood to flow worse or something or it could damage something more."  (Caldwell Dep. 19:24−20:3.)  Wallace testified that they ended up "being there another half-hour to forty-five minutes."  (Wallace Dep. 10:13−14.)  According to Snodgrass, after he approached the car:

> [Caldwell] probably sat there for a couple of minutes.  And we were trying to calm him down, and then we got him to pull over into the driveway, and he started to relax a lot and actually talking to us.  And, you know, then he swore he was fine and didn't need to go anywhere.  And, you know, we kept telling him, you know, you might need to go to the hospital or something, you know, you're really hurt; and he kept swearing he was fine.

(Snodgrass Dep. 14:3−11.)  Caldwell was in such pain that he could not physically maneuver the car he was in to be parked, so Snodgrass reached through the window and steered the car while Caldwell held his eye and slowly let his foot off the brake.  (Snodgrass Dep. 14:3−7; Caldwell

Dep. 20:22−21:4.)  Despite the fact that Caldwell was "going ballistic" after he was first hit, Snodgrass testified that, after the incident, Caldwell "started saying it wasn't even hurting him no more."  (Snodgrass Dep. 42:6, 12−14.)

Caldwell recalls that Wallace "didn't really say much at first other than checking to make sure I was okay and talking to me a little bit here and there.  I think, honestly, I think he was more worried about what had actually happened at that moment, because I think he was sort of in a state of shock like he didn't realize what actually happened."  (Caldwell Dep. 23:11−17.)  After the incident, and after Caldwell exited the vehicle, Caldwell spoke with Wallace.  Wallace apologized and said "something about giving [Caldwell] a set of mud tires for [his] truck."  (Id. 24:23−24.)  Caldwell testified that he thought Wallace "was basically trying to bribe [him] from telling anybody what had actually happened."  (Id. 25:4−6.)

Nevertheless, after resting and applying a bag of frozen peas to his eye, the pain began to subside and Caldwell did not seek medical attention "[b]ecause at that point [they] didn't really think it was that bad."  (Id. 26:3−4.)  According to Caldwell, they "had no idea actually how much damage was done until after [he] went to the doctor . . . ."  (Id. 26:4−6.)  In fact, after removing the frozen peas from his eye, Caldwell rode Snodgrass's dirt bike around the yard for "[m]aybe ten or fifteen minutes."  (Id. 27:12.)  Caldwell testified that he "started to get a headache and [his] eye started to throb," so he stopped.  (Id. 27:17−18.)  After that, Caldwell told the others that he was "going to take some Ibuprofen and lay down for a little while and see if it helps."  (Id. 27:20−23.)  When he arrived home, Caldwell's told his sister, Tabitha, what happened.  After assessing the injury to his eye, Tabitha did not believe his injury was serious. (Id. 28:20−29:2.)  Once Caldwell left the farm, Wallace did not see him again until the depositions in the present case.  (Wallace Br. pg. 2; Caldwell Dep. 33:24−34:15.)  Caldwell's

mother, Marjorie Mayberry, forbade Caldwell from speaking to Wallace.  (Mayberry Dep. 30:25−31:3, Oct. 8, 2013.)

Later in the day on May 3, Snodgrass found out "from other family members and stuff" that Caldwell was doing worse.  (Snodgrass Dep. 15:1−4.)  Wallace also attempted to learn information about the extent of Caldwell's injuries, periodically calling Snodgrass on the evening of May 3 and several times the next day.  (Wallace Dep. 16:3−9.)

Later in the evening on May 3, after the pain failed to subside, Caldwell was transported by ambulance to the Lynchburg General Hospital.  (See Caldwell Dep. 29:14−30:9.)  According to Mayberry, who met her son at the hospital, the treating doctor informed her that her son's injury was "severe" and that "there was some significant damage to the retina of his eye." (Mayberry Dep. 11:6−11.)  Caldwell was treated by Dr. Moss and, at either his initial hospital visit or a follow-up appointment, Dr. Moss diagnosed Caldwell with a detached retina.  (See Caldwell Dep. 30:13−19.)

During the course of Caldwell's treatment, Wallace was generally kept in the dark regarding Caldwell's condition and treatment.  Because of Mayberry's admonition that Caldwell not speak to Wallace, Snodgrass was Wallace's only source of information.  The day after the incident, Snodgrass said "something [to Wallace] about [Caldwell] going to a doctor."  (Wallace Dep. 18:7.)  Wallace admits that he "didn't really get any information out of Billy [Snodgrass] about it."  (Id. 18:10−11.)  Snodgrass likewise confirmed that he told Wallace that Caldwell was taken to the hospital, "but that's all [Snodgrass] really knew about it."  (Snodgrass Dep. 18:14−15.)  On May 4, Wallace learned that Caldwell had been taken to the hospital.  (Wallace Dep. 17:11−20.)

Shortly after the incident, Caldwell's mother contacted the Charlotte County Sheriff's Department about pressing charges against Wallace.  Mayberry surmised her son's injuries were severe and that the resulting medical bills would be more than she could handle.  (Mayberry Dep. 13:1−8.)  She also felt that "it needed to be known that [her] son was harmed in this way."  (Id. 13:6−8.)  Captain Howard Hobgood investigated the incident and, in doing so, spoke with Wallace and informed him that Caldwell had to seek medical treatment and that he had a detached retina.  (Hobgood Dep. 19:24−20:13, Oct. 16, 2013.)  Although Hobgood does not recall the exact conversation, he did testify that he would tell anyone the extent of the injuries: "You know, I would say, look, this could be right serious, or this is serious, he may have a detached retina, cornea, whatever it was."  (Id. 20:10−13.)  Wallace admits that he learned that Caldwell was undergoing "ongoing" medical treatment during a phone conversation with Hobgood in either May or June of 2010.  (Wallace Dep. 20:2−12, 20:25−21:2; Hobgood Dep. 18:18−20:13.)  After speaking with Hobgood and learning that criminal charges were a possibility, Wallace finally told his father about the incident.  (Wallace Dep. 21:17−22:6.)

Ultimately, Wallace was charged with a violation of Va. Code Ann. § 18.2-154, maliciously shooting into an occupied vehicle, a felony charge, in Virginia state court.  (See Wallace Dep. 22:12−19.)  Wallace was served with the official charging documents on June 16, 2010.  (Wallace Dep. 24:5−12.)  Wallace voluntarily surrendered to the local magistrate and was released on a $1,000.00 bond.  (Id. 28:18−20.)

After he was formally charged, Wallace recounted the incident in greater detail to his father.  (Id. 29:29:1−8.)  Wallace testified that he told his father that "the officer that called [him] had said [Caldwell] had been to a doctor's office."  (Id. 31:16−17.)  Wallace testified that he did not tell his father that Caldwell's treatment was ongoing because Captain Hobgood did not relay

that information to him (id. 31:18−22), although he also testified that Hobgood informed him Caldwell was undergoing "several medical treatments" (id. 20:2−12).

Eventually, Wallace and the Commonwealth's Attorney reached a plea agreement which required Wallace to pay a "restitution of damages," which he understood to be out-of-pocket expenses incurred by Caldwell's mother related to Caldwell's medical treatment.  (Wallace Dep. 42:15−43:7.)  Wallace's attorney recounted that the negotiations on the plea related to the fact that Caldwell "had a pretty serious injury to his eye."  (Angel Dep. 17:21−24, Oct. 8, 2013.) Wallace pleaded guilty to a misdemeanor and was sentenced to six months in jail with all six months suspended for one year.  (Wallace Dep. 44:1−5.)  No one mentioned Caldwell's injuries during the hearing.  (Id. 44:6−12.)

Wallace's father, Joseph Wallace ("Wallace Sr."), testified that he first became aware of the extent of Caldwell's injuries during the negotiations regarding his son's plea agreement at the preliminary hearing on October 19, 2010.  (Jos. Wallace Dep. 16:5−18, Oct. 8, 2013.)  He testified that, prior to that hearing, "[w]e really didn't even realize that or know that until we got to the criminal court . . . and settlement part of it.  That was . . . the first I knew of an injury . . . you know, and the expense and bills to it."  (Id. 16:8−18.)  Wallace Sr. recalled that the restitution amount was approximately $3,200.00, and that the money was for treatment expenses relating to the paintball incident.  (Id. 19:1−22.)  After the hearing, Wallace Sr. wrote a check for partial payment of his son's restitution amount.  (Id. 20:5−25.)

Once the criminal case was concluded, Mayberry spoke with an attorney about a problem with the restitution check Wallace Sr. had tendered at the criminal hearing.  (Mayberry Dep. 47:22−48:1.)  Although the check had the numerical value of $2,500.00, the written amount said "two thousand dollars."  (Id. Ex. 4.)  In a letter from her counsel to James Angel, Wallace's

criminal defense attorney, regarding the restitution check, Mayberry's attorney advised that "this restitution is what has been ordered by the Court as a result of a criminal case, and has nothing to do with damages to my client from a civil point and does not release your client from any future civil damages." (<u>Id.</u>).  That letter was dated November 8, 2010.  (<u>Id.</u>)

Part of the plea agreement also required that Wallace have no contact with Caldwell or his family members.  (Jos. Wallace Dep. 30:18−25.)   After the October 19, 2010, hearing regarding his son's criminal charges, Wallace Sr. had no further contact with Mayberry (Caldwell's mother).  Wallace Sr. was served with a summons and a copy of a civil state court complaint in late October of 2011.  (<u>Id.</u> 31:1−6.)  The complaint alleged that Caldwell sustained "serious and permanent injuries" as a result of Wallace's negligence, and demanded damages of $500,000.00.  (Compl. Ex. A.)  He immediately took a copy of the litigation documents to his State Farm Insurance agent, Jack Butler, on November 1, 2011.  (Jos. Wallace Dep. 31:7−11.)

At all relevant times, Wallace Sr. and his wife, Laura, were named insureds under a State Farm homeowner's policy ("the Policy").  (<u>See</u> Pl.'s Br. pg. 19.)  Because Wallace was a resident in his parents' home, State Farm concedes that he is an insured under the Policy as well.[1]  (<u>See id.</u>)  The Policy also stated, under the section titled "Liability Coverages," that "[State Farm] will pay the necessary medical expenses incurred or medically ascertained within three years from the date of an accident causing bodily injury. . . . This coverage applies only . . . to a person off the insured location, if the bodily injury . . . is caused by the activities of an insured." (Compl. Ex. B. pgs. 14−15.)  The Policy also imposed the following obligations on the insureds:

---

[1] The homeowner's policy defines "insured" as "you and, if residents of your household: your relatives . . . ." (Compl. Ex. B pg. 1.)

> **Duties After Loss.** In case of an accident or **occurrence**, the insured shall perform the following duties that apply. You shall cooperate with us in seeing that these duties are performed:
>
> a.  give written notice to [State Farm] or our agent as soon as practicable, which sets forth:
>
> (i)  the identity of this policy and **insured**;
>
> (ii)  reasonably available information on the time, place and circumstances of the accident or **occurrence**; and
>
> (iii)  names and addresses of any claimants and available witnesses;
>
> b.  immediately forward to us every notice, demand, summons or other process relating to the accident or **occurrence**.

(Id. Ex. B. pg. 18 [emphasis in original].) The Policy defines "occurrence" as "an accident, including exposure to conditions, which results in: bodily injury; or property damage; during the policy period." (Id. Ex. B. pg. 2.)

The parties agree that, following the paintball incident on March 3, 2010, Wallace Sr. informed State Farm about that accident only after receiving civil suit papers in late October of 2011. Wallace Sr.'s first contact with State Farm regarding the incident occurred on November 1, 2011. (See Jos. Wallace Dep. 36:9−12.) Wallace Sr. testified that he had not contacted his insurance agent before that time because he "[d]idn't realize it was an option that was available, that we'd need it . . . at that time." (Id. 36:14−17.) He testified that he only called his insurance agent when the lawyer who represented his son in the criminal trial recommended it. (Id. 45:8−12.) Wallace Sr. reiterated that, until his lawyer suggested it, he "didn't know that it was an option available," "didn't realize it was there for the use," and "[h]ad no idea, never been through anything like this, had no idea it would help." (Id. 45:15−46:2.)

On June 11, 2013, State Farm filed a Declaratory Judgment action in this Court asking me to declare that State Farm has no obligation to "provide Personal Liability coverage to Wallace for the claims made by Caldwell in the [state court] Liability Action due to his breach of

the above-referenced notice conditions of the Homeowners Policy . . . ."  (Compl. ¶ 18(b).)  At

the close of discovery, all parties moved for summary judgment.  (See Def. Caldwell Mot. for

Summ. J., Dec. 11, 2013 [ECF No. 22]; Def. Wallace Mot. for Summ. J., Dec. 16, 2013 [ECF

No. 24]; Pl.'s Mot. for Summ. J., Dec. 16, 2013 [ECF No. 26].)  All parties responded, and all

waived reply.  The Motions were heard on January 24, 2014.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine dispute of material fact and

the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); George & Co. LLC

v. Imagination Entertainment Ltd., 575 F.3d 383, 392 (4th Cir. 2009).  A genuine dispute of

material fact exists "[w]here the record taken as a whole could . . . lead a rational trier of fact to

find for the nonmoving party."  Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation

marks and citing reference omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  A genuine dispute cannot be created where there is only a scintilla of evidence favoring

the nonmovant; rather, the Court must look to the quantum of proof applicable to the claim to

determine whether a genuine dispute exists.   Scott v. Harris, 550 U.S. 372, 380 (2007);

Anderson, 477 U.S. at 249−50, 254.  A fact is material where it might affect the outcome of the

case in light of the controlling law.  Anderson, 477 U.S. at 248.  On a motion for summary

judgment, the facts are taken in the light most favorable to the non-moving party insofar as there

is a genuine dispute about those facts.  Scott, 550 U.S. at 380.  At this stage, however, the

Court's role is not to weigh the evidence, but simply to determine whether a genuine dispute

exists making it appropriate for the case to proceed to trial.  Anderson, 477 U.S. at 249.  It has

been noted that "summary judgment is particularly appropriate . . . [w]here the unresolved issues

are primarily legal rather than factual" in nature.  Koehn v. Indian Hills Cmty. Coll., 371 F.3d 394, 396 (8th Cir. 2004).

### III.   DISCUSSION

The parties concede that Virginia law governs this case, and there is no reason to believe that the law of any other jurisdiction would prevail.

As an initial matter, "[i]nsurance policy provisions requiring notice of an accident 'as soon as practicable' are reasonable and enforceable."  Atlas Ins. Co. v. Chapman, 888 F. Supp. 742, 745 (E.D. Va. 1995).  A requirement of "timely notice of an accident or occurrence is a condition precedent to an insurance company's liability coverage requiring 'substantial compliance by the insured.'"  State Farm Fire & Cas. Co. v. Walton, 244 Va. 498, 504 (1992) (quoting Liberty Mut. Ins. Co. v. Safeco Ins. Co. of Am., 223 Va. 317, 323 (1982)).  "An 'occurrence' which gives rise to a duty of notice to an insurance company means an 'incident which was sufficiently serious to lead a person of ordinary intelligence and prudence to believe that it might give rise to a claim for damages covered by [the] policy.'"  Id. (quoting Black's Law Dictionary 1080 (6th ed. 1990)).

"Virginia law does not require than an insurance company be prejudiced by the delay in notification; a prolonged delay in notification alone may breach the policy even absent a showing of prejudice."  Penn-America Ins. Co. v. Mapp, 461 F. Supp. 2d 442, 452 (E.D. Va. 2006) (citing Walton, 244 Va. at 504).  "[I]n order for untimely notification to constitute a breach the policy, such that the insurer no longer bears the duty to defend the insured, the failure to notify must be substantial and material."  Id. (citing State Farm Mut. Auto. Ins. Co. v. Porter, 221 Va. 592, 597 (1980)).  Three factors bear upon the materiality of a breach of the notice provision of a policy: "(1) the reasonableness of the delayed notice, (2) the amount of prejudice suffered by the insurer

as a result of the delay, and (3) the length of time that elapsed before notice was given." Id. (citing North River Ins. Co. v. Gourdine, 205 Va. 57, 62 (1964); Walton, 244 Va. at 504).

"In determining the reasonableness of an insurer's notice, the Virginia Supreme Court follows an objective standard, requiring that an insurer be notified whenever it should reasonably appear to the insured that the policy may be implicated." Id. at 453 (citing Dan River Inc. v. Comm. Union Ins. Co., 227 Va. 485, 489 (1984)). "Failure to give timely notice will not be excused when the insured *subjectively* concludes that coverage under the policy will not be implicated or is ignorant of the notice provisions." Id. (citing Chapman, 888 F. Supp. at 742) (emphasis added).

In most cases, the question of the reasonableness of a notice delay is a question for a jury. See State Farm Fire & Cas. Co. v. Scott, 236 Va. 116, 120 (1988). The question of whether notice has been given "as soon as practicable" is generally "one of fact for the jury, or the court sitting without a jury, when the facts are disputed or the inferences are uncertain, or when there are extenuating circumstances for the delay . . . ." State Farm Mut. Auto. Ins. Co. v. Douglas, 207 Va. 265, 268 (1966). In cases "where reasonable men could not differ as to the inferences to be drawn from undisputed facts," "the question of delayed notice may be decided as a matter of law . . . ." Chapman, 888 F. Supp. at 745; see also Douglas, 207 Va. at 268 ("[W]hen the facts are undisputed and certain the question becomes one of law for the court.").

Furthermore, it is undisputed that an insurance policy is a contract to which the ordinary rules of contract interpretation apply. See TravCo Ins. Co. v. Ward, 736 S.E.2d 321, 325 (Va. 2012). It is likewise undisputed that the parties to a contract are presumed to have read and understood the terms of the contract into which they have entered. See Calbreath v. Va. Porcelain & Earthenware Co., 63 Va. (22 Gratt.) 697, 717 (1872); see also Gibbes, Inc. v. Law

Eng'g, Inc., Case No. 91-1048, 1992 WL 78830, at *5 (4th Cir. Apr. 20, 1992; In re Prudential Ins. Co. of Am., 148 S.W.3d 124, 134 (Tex. 2004) (noting the presumption applies "absent some claim that [the parties] were tricked into agreeing to" the terms of a contract).  If a party fails to read a contract which he signs, he does so at his peril.  See Metro Realty of Tidewater, Inc. v. Woolard, 223 Va. 92, 99 (1982) ("In the absence of fraud, duress, or mutual mistake, a person 'having the capacity to understand a written document who reads it, *or*, without reading it or having it read to him, *signs it*, is bound by his signature.'") (quoting Rossi v. Douglas, 203 Md. 190, 199 (1953)) (emphasis added).  Because no party has asserted that Wallace Sr. lacked the competence to enter into the contract with State Farm, these rules apply to the present case.[2]

Defendants are correct that the prevailing Virginia cases on delay notice provisions in an insurance contract state that the duty to notify arises when it is objectively reasonable to conclude that an incident could give rise to a claim for damages *under the policy*.  See Walton, 244 Va. at 504 (". . . might give rise to a claim for damages *covered by [the] policy*.") (emphasis added); see also Penn-America Ins. Co. v. Mapp, 461 F. Supp. 2d 442, 453 (E.D. Va. 2006) (". . . whenever it should reasonably appear to the insured that the policy may be implicated."); Dan River Inc. v. Comm. Union Ins. Co., 227 Va. 485, 489 (1984) (". . . involves potential or actual liability under the insurance contract . . . .").  Therefore, the crux of this case turns on the language of the Homeowners Policy ("the Policy").  One of the main disagreements among the parties is whether it was objectively reasonable to know that the Policy covered the incident.  On this point, the Policy language is instructive and, in this case, definitive.

The Policy states in precise and unequivocal terms:

> We [defined elsewhere in the Policy as State Farm] will pay the
> necessary  medical  expenses  incurred  or  medically  ascertained

---

[2] If Wallace Sr. lacked the requisite capacity to enter into the contract, then his obligations under the contract could be avoided.

> within three years from the date of an accident causing bodily
> injury. . . . This coverage applies . . . to a person off the insured
> location, if the bodily injury . . . is caused by the activities of an
> insured.

(Compl. Ex. B. pgs. 14−15.)   The Policy defines "insured" as the people named on the Policy (Wallace Sr. and his wife, the "named insured") and any relatives of the named insured that live in the household (such as Wallace).   (Compl. Ex. B. pg. 1.)

This provision of the homeowners' policy is no doubt surprising; the fact that two experienced lawyers were unsure if the Policy would apply to the incident is persuasive that the provision was not generally known.   The rules of contract interpretation, however, do not permit an exception to generally applicable notice requirements where the implicated coverage provision of the policy is unexpected, but is written in clear and definitive language.   Because Wallace Sr. is presumed to have read and understood his Policy, he is charged with the knowledge of its contents.   Given the applicable policy language, it is objectively reasonable that Wallace Sr. should have known that the Policy would have covered the incident.   Therefore, the fact that the incident occurred in a different county and not on property owned by the Wallaces does not excuse them from the applicable notice provision of the Policy.   Accord Nationwide Mut. Fire Ins. Co. v. Overstreet, 568 F. Supp. 2d 638, 645 (E.D. Va. 2008) ("[I]t is no defense to a claim that notice was untimely to say that the insured subjectively did not understand his policy might be implicated."); Dan River, Inc. v. Comm. Union Ins. Co., 227 Va. 485, 489 (1984) ("Failure to give timely notice will not be excused when the insured only subjectively concludes that coverage under the policy will not be implicated."); Lord v. State Farm Mut. Auto. Ins. Co., 224 Va. 283, 288 (1982) (noting that a delay was not caused by some permissible rationale, but because the insured "simply was ignorant of the policy provisions which . . . may have covered his medical expenses.").

Defendants' reliance on Penn-America Insurance Co. v. Mapp to avoid this conclusion is misplaced.  On July 4, 2003, April Mapp and some companions left the Three Cheers Bar after a night of drinking.  See Mapp, 461 F. Supp. 2d at 445−46.  While in the parking lot after the bar had closed, Joshua Bristol was giving Mapp's friend a ride around the parking lot on his motorcycle.  Id. at 446.  While driving through the parking lot, Bristol "briefly stopped the motorcycle before he 'floored it,' driving straight ahead along the driveway between the parking lot and the bar in the direction of the crowd of approximately fifteen (15) to twenty (20) people that had just exited the bar."  Id.  Bristol hit Mapp, and she was seriously injured.  Id.  Mapp sued the bar owners (ACH) in state court, alleging that they served Bristol alcohol to the point of intoxication, and that they did so "with notice that he would unlawfully operate a motor vehicle on the premises . . . ."  Id.  Although ACH's demurrer on charges stemming from its service of alcohol to Bristol was sustained under Virginia's prohibition against dram shop liability, the remaining allegations survived.  Id. at 447.

After the incident, ACH failed to notify its insurance carrier.  Like Wallace in this case, ACH only notified the insurer two days after it was served with process in the state court action.  See id.  In holding that the two-year delay was not unreasonable, the court suggested it was reasonable for the bar owners to believe that a claim against them would not stand because Virginia law specifically excluded them from "dram shop" liability.  See id. at 454.  Accord Nationwide Mut. Ins. Co. v. Boyd Corp., Case No. 3:09-cv-211-HEH, 2010 WL 331757, at *7 n.3 (E.D. Va. Jan. 25, 2010).  Here, however, there is no basis in law for the Wallaces to believe that a claim would not be made against them.  Unlike the bar owners in Mapp, there is no provision of the common law that would have excused Wallace of liability for his negligent acts.  See, e.g., Williamson v. Old Brogue, Inc., 232 Va. 350, 352−54 (1986) (citing Felder v. Butler,

292 Md. 174, 176 (1981), for the common law presumption that "an innocent third party did not have a cause of action against a vendor of alcoholic beverages for injuries suffered as a result of the intoxication of the vendor's patron," and applying it pursuant to the statute which incorporated the common law in Virginia, Va. Code Ann. § 1-10, which is now codified at § 1-200).  Therefore, the reasonable basis for ACH's belief that it *could not* be sued does not justify Wallace's belief that he *would not* be sued.

Caldwell argues that a review of State Farm v. Walton establishes that the duty to notify is triggered only when the insured knew or should have known that coverage would apply, arguing that it was only the receipt of a letter from Attorney Frank Meade which obligated Walton's step-father to report the incident to his carrier.  While the underlying conclusion is correct—that it is the implication of coverage which triggers the duty to report—the Walton court was not as generous in its holding as Caldwell argues.  It is true that the court concluded that the letter was, in itself, sufficient to trigger the notice provision because Meade's invocation of the homeowner's policy was explicit.  State Farm Fire & Cas. Co. v. Walton, 244 Va. 498, 504 (1992).  The court did *not* say, however, whether the duty to notify the insurer arose *before* that point.  The court said: "Although there might be some dispute as to whether the duty of notice arose after the sheriff and fire chief interviewed Wade in his mother's presence, there can be little doubt that such a duty arose upon Mr. Hammock's receipt of Meade's letter, which Wade admitted receiving."  Id.  In essence, the court held that, once the implication of coverage was made explicit, that was a definitive point at which the duty arose; they did not answer the question of whether the insured should have known earlier.  Accord id. ("And, contrary to the defendants' contention, we conclude that this duty to give notice 'as soon as practicable' after an 'occurrence' arose long before Wade was served with process in the . . . first action against

him.").  Because there was no definitive invocation of the Policy in this case, the rationale of the Walton court to avoid the ultimate question is inapposite.

Defendants next argue that, given all of the circumstances, it was objectively reasonable for Wallace or Wallace Sr. not to conclude that Caldwell's injury was sufficiently serious to give rise to a claim for damages.  In support of this, they cite: (1) Caldwell's behavior after the incident (which includes refusing to be transported to a hospital and resuming his activities after approximately 30 minutes of rest); (2) the lack of communication between Caldwell's family and the Wallace family; (3) the fact that Capt. Hobgood was unsure if he indicated Caldwell had a detached retina; (4) injury is not a necessary element of the crime of which Wallace was charged; (5) no details were given regarding the computation of the restitution Wallace agreed to pay as part of the plea agreement; and (6) there was no contact between Caldwell and Wallace following the conclusion of the criminal phase and Wallace's receipt of civil suit papers.

Taking the timeline in reverse chronological order, if the first time Wallace should have been aware that a claim for damages under the Policy was a possibility was the day he received notice of the civil suit, then the delay was clearly not unreasonable.  A delay of two days is likely faster than anticipated.

The next possible date at which Wallace could have known about the severity of Caldwell's injury was at the criminal hearing.  From that date (October 19, 2010) until the date State Farm was notified of the claim (November 1, 2011), 378 days passed.  Under Virginia law, that appears to be a range that is, as a matter of law, unreasonable.  See Va. Farm Bureau Mut. Ins. Co. v. Sutherland, Case No. 7:03-cv-122, 2004 WL 2360162, at *2 (W.D. Va. Oct. 19, 2004) ("Virginia courts have generally held that notice given beyond 75 days, without a reasonable excuse, is untimely."); Atlas Ins. Co. v. Chapman, 888 F. Supp. 742, 747 (holding delay of 126

days unreasonable as a matter of law); <u>Lord v. State Farm Mut. Auto. Ins. Co.</u>, 224 Va. 283, 288 (1982) (holding 173-day delay unreasonable).  The question thus becomes, would a man of ordinary prudence and intelligence have known, at the conclusion of the criminal action, that Caldwell's injury was sufficiently serious to implicate a claim which the policy would cover? The answer to that question must be "yes."

On the date that Wallace and his father were informed of the restitution amount— $3,273.73—they knew the following: (1) prior to the incident, Wallace and Snodgrass were shooting paintballs at each others' feet (Caldwell Dep. 11:22−25); (2) at the time of the incident, Wallace was shooting paintballs out of a gun that used a $CO_2$ cartridge to expel the paintballs; (3) one of those paintballs went through an open car window and hit Caldwell in the eye; (4) Caldwell was in such pain that he could not physically maneuver the car he was in to be parked, so Snodgrass reached through the window and steered the car while Caldwell held his eye and slowly let his foot off the brake (Snodgrass Dep. 14:3−7; Caldwell Dep. 20:22−21:4); (5) Caldwell sat for 15-30 minutes with frozen vegetables on his eye; (6) Caldwell's eye was red and swollen; (7) after resuming his activities, Caldwell left to go home, lay down, and take some ibuprofen to relieve the pain; (8) Caldwell was seen by a doctor the next day; (9) Wallace called Snodgrass "periodically" the next day, attempting to obtain information regarding Caldwell (Wallace Dep. 16:3−9); (10) Caldwell's mother did not want Caldwell to have any contact with Wallace, indicating the seriousness of the injury; (11) a criminal complaint was filed, and Wallace was charged with a felony as a result of the incident, a felony which charged him with "maliciously" shooting into an occupied vehicle; (12) Capt. Hobgood informed Wallace, at a minimum, that Caldwell was injured, or alternatively, that he had a detached retina; (13) Capt. Hobgood informed Wallace that Caldwell was undergoing "several medical treatments" and that

his care was "ongoing" (Wallace Dep. 19:17−20, 20:4−5); and (14) Caldwell's mother's out-of-pocket expenses for his medical care totaled at least $3,273.73.

Under these facts, it is difficult to say that a reasonably prudent man would not have known that Caldwell's injury was serious.  He was shot in the eye with a projectile which was fired using compressed $CO_2$.  Wallace had been shooting paintballs earlier at Snodgrass's feet, indicating that he was aware of the damage they could cause if aimed at vital organs.  Wallace knew that Caldwell was injured while he was unloading his paintballs and felt guilty after the incident, indicating that he knew that it was a paintball that hit Caldwell and not flying debris from some other source.  The eye was red and swollen, and Caldwell eventually left to take some pain relievers.  When coupled with his knowledge that Caldwell eventually sought medical attention and the medical bills totaled over $3,000.00, Wallace's belief that the injury was not sufficiently serious was objectively unreasonable.[3]

---

[3] There is an argument to be made that Wallace and his father were not privy to the same information, and that it is only what Wallace Sr. knew that is relevant.  Under this theory, Wallace Sr., as the named insured, was only aware that Caldwell was hit in the eye and that criminal charges were filed.  With only that limited amount of knowledge, his belief that the injury was not sufficiently serious to implicate coverage under the policy was objectively reasonable.  Whether this argument is meritorious is irrelevant; the Supreme Court of Virginia considered and rejected this argument in Walton, under a notice provision identical to the one at issue here.  In Walton, the defendants argued that Wade Walton, as an additional insured, did not have the duty to notify that the insureds did because the policy only required the "named insureds" to "cooperate with [State Farm] in seeing that these [notice] duties are performed . . . ."  Walton, 244 Va. at 503.  The court held:

> The first sentence of the provision for "[d]uties after loss" clearly requires Wade, as an additional insured, to perform the listed duties that are applicable. One such duty is that of giving written notice to State Farm of the identity of the Hammocks' policy and of Wade's status as an additional insured. The second sentence does not cast that duty entirely upon the Hammocks; it merely requires them to "cooperate" in seeing that Wade's duty is "performed." Thus, had Wade lacked the maturity and judgment to appreciate the duty of timely notice that was imposed upon him by the policy, or had he been otherwise unable or unavailable to give such notice, the second sentence would have required the Hammocks to see that Wade's duty of timely notice was performed by giving notice on his behalf.

Moreover, Wallace's own actions the next day belie his claim that he did not believe the injury was serious.  He admittedly called Snodgrass "periodically" the day after the incident "to check on [Caldwell] . . . .  [He] called several times that night and probably several times the next day . . . just to see if he was okay, if the swelling had gone down."  (Wallace Dep. 16:3−17.)  If Wallace did not believe the injury was serious, there would not be a need for extensive follow-up on his behalf.  If Wallace was worried about the injury and, more likely, repercussions against him personally, his actions would be reasonable.  If he was concerned about his liability, then he reasonably should have concluded that the injury was sufficiently serious to give rise to his obligations under the Policy.

Because the duty to give notice arose, at the latest date, over a year before notice was actually given, the next question is whether the delay was material and substantial.  The parties all agree that the delay was substantial, so the only issue to consider is the materiality of the delay.  Although State Farm argues that this is a case where no notice was given, see, e.g., Walton, 244 Va. at 504−05 ("[W]hen no notice is given, lack of prejudice is not an issue, and the failure to give the required notice becomes a matter of law."), notice was eventually given to State Farm.[4]   The notice given, therefore, should be reviewed according to the prevailing standards applicable under Virginia law.

In Mapp, the Eastern District of Virginia summarized the applicable law of notice as follows:

---

Id. at 503−04.  Thus, even if Wallace was unaware of his duty to notify State Farm, Wallace Sr. had the obligation to step in and ensure that notice was given in a timely manner.

[4] An example of a case where "no notice was given" would be State Farm v. Porter.  In that case, "[t]he insured never gave notice to the company of the accident, never gave notice of suit or forwarded suit papers, and never cooperated."  State Farm Mut. Auto. Ins. Co. v. Porter, 221 Va. 592, 599 (1980).  While the Wallaces were delayed in notifying State Farm of the suit, they did notify it eventually and it appears there have been no allegations of a lack of cooperation.

> Virginia law does not require that an insurance company be prejudiced by the delay in notification; a prolonged delay in notification alone may breach the policy even absent a showing of prejudice.   However, in order for untimely notification to constitute a breach of the policy, such that the insurer no longer bears the duty to defend the insured, the failure to notify must be substantial and material.   There are three factors that bear upon the materiality of such a breach: (1) the reasonableness of the delayed notice, (2) the amount of prejudice suffered by the insurer as a result of the delay, and (3) the length of time that elapsed before notice was given.

Penn-America Ins. Co. v. Mapp, 461 F. Supp. 2d 442, 452 (E.D. Va. 2006) (internal citations omitted).  Given the Mapp court's conclusion that a prolonged delay alone may suffice to breach the policy, it appears that if any single factor is of a sufficient severity, that will be enough to constitute a material breach of the policy.  See, e.g., Walton, 244 Va. at 504−05 (holding that a substantial delay was sufficient to constitute a breach of the policy as a matter of law without addressing either reasonableness of the delay or prejudice to the insured).

In light of the aforementioned analysis regarding the objectively unreasonable belief that no claim for civil damages would lie against Wallace, as well as the 378-day delay in notifying State Farm about the incident, even if State Farm suffered no prejudice as a result of the delay, Virginia law compels the conclusion that the delay was material.  Because Defendants concede that the delay was substantial, and because the delay was unreasonable, under Virginia law, State Farm should be excused from its obligations under the Policy.  See Porter, 221 Va. at 597.

Finally, Defendants cite Dabney v. Augusta Mutual Insurance Company to excuse Wallace's delay in notifying State Farm of the potential claim.  In that case, the Supreme Court of Virginia held that whether a 254-day delay was reasonable under the circumstances was an issue on which reasonable minds could differ, and therefore the trial court erred in deciding the issue as a matter of law as opposed to submitting the question to the jury.  See Dabney v.

Augusta Mut. Ins. Co., 282 Va. 78, 89 (2011).  While the case is persuasive, it does not change my ultimate conclusion.  Unlike in Dabney, there is no question here about when Wallace knew about Caldwell's injuries.  See id. at 88 ("[I]t is not clear when Jenkins first learned of the attack.").  There is no issue concerning the death of an insured and an accompanying unawareness, by the administrator of the estate, of the existence of a policy.  See id. ("Also, Jenkins did not discover the Augusta policy until after she made a claim under the policy for a house fire . . . .").  There is no issue concerning attempted notification of State Farm after State Farm had changed its address without notifying its insured.  See id. at 88−89 ("The letter, sent by her attorney Hale, was sent to the address listed in the Augusta policy, which unbeknownst to Jenkins was not Augusta's current address at the time the letter was sent.").  While I agree with the Supreme Court of Virginia that reasonable minds could differ as to whether the delay was reasonable in Dabney, I do not believe reasonable minds could differ as to the outcome of this case.  For this reason, I conclude that the delay in notifying State Farm of Caldwell's injuries was substantial and material as a matter of law.

## IV.   CONCLUSION

The parties agree that the delay in notifying State Farm was substantial.  Giving Wallace the benefit of the doubt, he certainly should have been aware on October 19, 2010, that Caldwell's injury was sufficiently serious that it might lead to a claim covered by Wallace Sr.'s

homeowners' policy.  The subsequent 378-day delay in notifying State Farm of the claim was material and substantial.  Therefore, State Farm is relieved of its obligations of coverage under the Policy.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 3rd day of February, 2014.


s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE